UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

BRUCE ROXBY,

                                           CASE NO.  00-6197-CIV-ZLOCH

        Plaintiff,                         Magistrate Judge Seltzer

v.

SUN LIFE OF CANADA, SUN LIFE OF
CANADA REINSURANCE COMPANY, SUN
LIFE ASSURANCE COMPANY OF CANADA,
and SUN LIFE OF CANADA (U.S.)
DISTRIBUTORS, INC.,

        Defendants.

_____/



## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

### I. Introduction

This case ensued as the result of Sun Life's wrongful termination of Mr. Roxby's

long-term disability benefits pursuant to the terms of a group disability plan issued to Mr.

Roxby through his employer by Sun Life. The Sun Life disability plan is governed by

the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. (ERISA). Sun

Life has asked this Court to enter summary judgment in its favor because its decision to

terminate Mr. Roxby's benefits was proper due to the absolute deference accorded to it by

the plan and ERISA.

However, the Sun Life disability plan does not contain the requisite discretionary

language required by ERISA to bestow any deference to Sun Life. Furthermore, even if

the plan did contain the requisite discretionary language, Sun Life was acting under an

inherent conflict of interest and its decision to terminate Mr. Roxby's disability benefits is

not entitled to the amount of deference accorded to a plan administrator acting without a conflict of interest. Sun Life's decision does not survive scrutiny when given little or no deference.

Sun Life's decision to terminate Mr. Roxby's disability benefits was unreasonable under any standard of review. Sun Life's two stated bases for terminating Mr. Roxby's benefits are untenable. Even a cursory review of the administrative record shows that Sun Life rejected the conclusions of Mr. Roxby's treating physician, a physiatrist and medical doctor, in favor of Sun Life's paid consultants who were not even doctors, much less medical doctors. Sun Life's second purported reason for terminating Mr. Roxby's benefits, that he refused to attend a Functional Capacity Exam, is a red herring. Mr. Roxby has no obligation under the terms of the Sun Life disability plan to be examined by a Sun Life consultant who is not a medical doctor, especially when the examination would have no bearing on his entitlement to disability benefits.

The fact is Sun Life terminated Mr. Roxby's benefits while in possession of uncontroverted medical evidence of his disability. Furthermore, the Social Security Administration has determined that Mr. Roxby is totally disabled from any occupation based upon the same evidence submitted to Sun Life. Sun Life's decision to terminate Mr. Roxby's benefits was arbitrary and capricious. Not only should Sun Life's Motion for Summary Judgment be denied, but summary judgment should be entered in favor of Mr. Roxby. See, Ramsey v. Coughlin, 94 F.3d 71, 73 (2nd Cir. 1996).

## II. Plaintiff's Statement of Material Facts[1]

Mr. Roxby was employed by JM Pontiac as line technician (heavy mechanic)[2]. [R. 89.] Mr. Roxby had worked exclusively as an auto mechanic for about thirty-three

2

years except for some training and experience in air traffic control in the military

approximately twenty years ago. [R. 89.] Through his employer, Mr. Roxby was

enrolled in a group benefit plan which included disability benefits issued by Sun Life[3].

The purpose of the disability plan was to provide Mr. Roxby the lesser of sixty percent of

his monthly salary, seventy percent of his monthly salary with certain offsets or twenty-

one thousand dollars [R. 489.] in the event that he became totally disabled as defined in

the plan:[4]

> "An Employee is totally disabled if he is in a continuous state of
> incapacity due to Illness which:
> 1. while it continues throughout the Elimination Period and during the
> following 60 months of incapacity, prevents him from performing all of
> the material duties of his regular occupation;
> 2. while it continues thereafter, prevents him from engaging in any
> occupation for which he is or becomes reasonably qualified by education,
> training or experience."

Sun Life Plan, Exhibit A, p. 6 [R. 074.]

Approximately five years before he made the subject claim, Mr. Roxby was

involved in a motor vehicle accident where he suffered a C6-7 herniated disk, multiple

bulging disks and residual neck and left arm pain. See, June 14, 1993 report of Alan K.

Novick, M.D., p. 1 [R. 296.] (attached as **Exhibit B**). On May 23, 1993, Mr. Roxby was

"working under a car when he went to stand up hitting his head on a tire." Id. The 1993

accident exacerbated the injuries sustained in the previous motor vehicle accident and

made it impossible for Mr. Roxby to return to work as an auto mechanic.

---

[1] Mr. Roxby controverts Sun Life's version of the facts as set forth in this section.

[2] Mr. Roxby will cite to the administrative record, attached as Exhibit B to the Affidavit of Lee Ann Prior, submitted by Sun Life in support of its Motion for Summary Judgment and will reference the documents in the same manner as Sun Life, where necessary and appropriate.

[3] A copy of the Sun Life disability plan is attached as **Exhibit A**.

[4] There is no maximum benefit period in the Sun Life plan for disabilities that begin prior to age sixty, therefore, disability benefits are payable for life.

Since he could no longer work, Mr. Roxby applied for the disability benefits
promised under the terms of the Sun Life plan. Sun Life acknowledged that Mr. Roxby
was totally disabled and began paying benefits in accordance with the terms of the plan[5].
On August 11, 1993, Dr. Novick discontinued Mr. Roxby's therapies because they had
not "shown any significant benefit" to him[6]. Dr. Novick determined that Mr. Roxby had
reached maximum medical improvement (MMI) on December 8, 1993[7].

Sun Life paid Mr. Roxby's benefits, but at the same time it continually looked for
ways to terminate payment of Mr. Roxby's claim due to the "significant exposure Sun
Life has here[8]." At first, Sun Life looked into returning Mr. Roxby to work at light duty
or to office work, but he was "not qualified for any office work[9]." Sun Life next looked
into a vocational rehabilitation program, but by its own report, Mr. Roxby's potential for
vocational rehabilitation was only a three out of five due to his date of birth, diagnosis
and limitations[10]. Sun Life then looked at returning Mr. Roxby to his former occupation
with accommodations or at another position, but this was not possible.

> "Ms. Kelly stated that due to Mr. Roxby's physical restrictions on posture
> changes (ability to frequently and at will stand as needed), J.M. Pontiac
> was unable to develop a modified position for Mr. Roxby. Ms. Kelly went
> on to explain that attempts had been made to return Mr. Roxby to J.M.
> Pontiac in a modified position. Ms. Kelly assessed that **the position of
> service writer would be too physically demanding** as this position with
> J.M. Pontiac does require constant [sic] and walking, and sitting is not
> involved. Ms. Kelly stated that she had also looked into Mr. Roxby's
> returning as a porter. She assessed that the porter position, which involves
> heavy lifting, sweeping, and performing other duties as needed, would be
> too heavy for Mr. Roxby. Mr. Roxby's occupation as a mechanic could
> not be modified to allow him to sit as needed."

---

[5] The February 11, 1994 letter approving benefits [R. 418.] is attached as **Exhibit C**.

[6] The August 11, 1993 report of Dr. Novick [R. 299.] is attached as **Exhibit D**.

[7] The December 8, 1993 report of Dr. Novick [R. 304.] is attached as **Exhibit E**.

[8] The March 7, 1994 memo [R.15.] is attached as **Exhibit F**.

[9] Record of Telephone Conversation dated February 10, 1994 [R. 420.], attached as **Exhibit G**.

[10] See, Vocational Rehabilitation Review Form dated March 2, 1994 [R. 16.], attached as **Exhibit H**.

4

April 14, 1994 from Dru West Jackson, Rehabilitation Counselor [R. 401-02.] (attached as **Exhibit I**)(emphasis added).

By 1996, Sun Life had decided that regardless of the medical evidence of

disability, it was going to find a way to terminate this claim whether it be through an

"Orthopedic IME" or through "surveillance":

> "WATCH THIS CLAIM CLOSELY I see no reason why this claim should be paid anymore. EE is a 60 month own/occ = Nov 30, 1998. Please advise."

November 22, 1996 note from R. Johnson [R. 288.] (attached as **Exhibit J**)(emphasis in original).

Sun Life's in-house rehabilitation consultant, William Harney, determined that it

"may not be easy to terminate at any occ[11]" and suggested developing a plan of action to

handle Mr. Roxby's claim[12]. This plan of action consisted of waiting until the sixty

month own occupation period had expired and challenging Mr. Roxby's ability to

perform some other occupation. Sun Life apparently determined that the suggested

Orthopedic IME (See, Exhibit J, *supra*) would confirm that Mr. Roxby was totally

disabled from any occupation and entitled to benefits, so Sun Life, instead, sent Mr.

Roxby to a Functional Capacity Exam on November 19, 1998[13] which contained the

following observations:

> "Mr. Roxby's pain complaints presently are a stabbing/burning pain surrounded C&; numbness with pins & needles over right cervicoscapular region; burning centrally over lumbosacral region; and an aching pain down posterior right leg from mid-thigh to knee. He reported his pain is at an intensity of 5 (0 = no pain; 10 = severe pain). He reported that recently his pain ranges from a 5 at best to 10 at its worst. He stated that walking aggravates his symptoms the most, and that hot baths provide the most

---

[11] Referring to the requirement that Mr. Roxby be disabled from any occupation after sixty months to receive benefits.

[12] The August 7, 1997 note from W. Harney [R. 266.] is attached as **Exhibit K**.

[13] This date was three days prior to the change to an any occupation disability requirement of November 22, 1998.

completed

relief. He currently takes aspirin three times per day to help manage he pain symptoms. At the end of the evaluation, he said that his pain was at the same intensity as it was prior to evaluation, but that he was now more uncomfortable. He called **the following day** to update us on his condition as instructed. He reported **his pain at that time was now an 8 out of 10** with most of his pain in his neck and shoulders."

EmpNet F.C.E. Summary/Work Capacities Assessment Report [R. 89.] (attached as **Exhibit L**)(emphasis added).

During the testing portion of the examination, the following comments were made

by the physical therapist and M.S.[14] who performed the examination:

"Mr. Roxby's lifting abilities were self limited due to **pain and fatigue**. Mr. Roxby requested to terminate frequent lifting evaluation due to fatigue. At this time, his heart rate was 100bpm and his blood pressure was 132/80. He was noted to be moderately short of breath at this time."

Exhibit L [R. 93.] (emphasis added).

"Mr. Roxby is right-hand dominant. **He assists his right hand during writing with the left as if to push right hand along**. Intermittently, his right elbow is elevated significantly during writing. He reports that he pushes his hand along due to weakness and was unaware of his elbow movement. His writing is shaky but legible. Firm grasp is limited in right hand due to complaints of fatigue and decreased sensation. **Sustained bending and overhead reaching were limited due to complaints of increased neck, shoulder, and low back pain**."

Exhibit L [R. 94.] (emphasis added).

Despite these observations and comments, the Functional Capacities Examination

concluded that Mr. Roxby could work at a medium physical demand level. See, Exhibit

L [R. 86.][15] Based on the Functional Capacity Examination (FCE), Sun Life's

rehabilitation consultant, William Harney (See, Exhibit K, discussed *supra*), performed a

Transferable Skills Analysis (TSA) and concluded that Mr. Roxby could do a number of

---

[14] It should be noted that neither of the individuals who performed the examination were medical doctors.

6

jobs including, *inter alia*, a Service-Repair Estimator[16]. See, Transferable Skills Analysis

[R. 82-85.], p. 2, attached as **Exhibit M**. Sun Life discontinued payment of benefits on

November 22, 1998[17], but did not formally deny the claim until July 1, 1999[18]. The

termination of benefits was primarily based on the results of the FCE and TSA and

specifically stated that Mr. Roxby could perform the job of a Service-Repair Estimator

(Service Writer). The termination of benefits was also based on the opinion of Sun Life's

in-house cardiologist that Mr. Roxby was not disabled from a cardiovascular point of

view, though Sun Life noted that Mr. Roxby's cardiovascular problems had little to do

with his disability. [R. 65.]

Mr. Roxby, through counsel, appealed the termination of benefits and pointed out

the erroneous nature of its conclusions, especially the fact that only the cardiac problems

were commented on while specifically ignoring the orthopedic and neurological problems

and not even considering the interplay between these three areas[19]. Sun Life reviewed

the claim and basically acknowledged that it had made the erroneous conclusions that Mr.

Roxby's appeal letter had referenced.

> "Med consult 6/10/99: clmt has sed or light duty capacity based on cardio
> and back info. (Cardiologist agrees w/FCE **but won't comment on
> neurological aspects** 4/13/99).
>
> . . .

---

[15] It should also be noted that the choices for a physical demand level ranged from "sedentary" to "very heavy" meaning that **anyone** who was given this Functional Capacity Evaluation would be capable of at least sedentary work and thus be ineligible for benefits under an any occupation definition of disability.
[16] A Service-Repair Estimator is another name for a Service Writer, the exact job that JM Pontiac determined was "too physically demanding" for Mr. Roxby. See, Exhibit I, discussed *supra*. It is also disingenuous to believe that Mr. Roxby's experience in air traffic control more than twenty years ago in a military setting could possibly be transferred to a present day position in the civil sector.
[17] This prompted the letter from the Hicks & Anderson law firm [R. 69-76.]
[18] The July 1, 1999 denial letter [R. 63-65.] is attached as **Exhibit N**.
[19] The August 27, 1999 appeal letter [R. 53-55] is attached as **Exhibit O**. Also see, the January 7 and June 3, 1999 reports of Dr. Perkins [R. 77-78], attached as composite **Exhibit P**.

7

> Clmt appeals through atty and submits OTN dated 1/7/99 from Dr. Perkins (last saw clmt 8/7/98) who asserts that **clmt only has PT minimal capacity work capacity.**"

October 10, 1999 memo to file [R. 49.], attached as **Exhibit Q** (emphasis added).

> This memo also listed an additional reason for not terminating the claim.

> "REC: **gainful is an issue. Voc identified occs that are not gainful (60% of pre-dis indexed earnings) but are w/in clmt's skills.** *Claim is payable unless med supports functional capacity for own occ or voc can identify gainful any occs.* Consider further investigation of functional capacity and/or settlement."

Id (emphasis added).

Instead of having Mr. Roxby examined by a medical doctor who could render a legitimate opinion regarding his functional capacity to work, Sun Life's "further investigation of functional capacity" consisted of scheduling surveillance and **another** Functional Capacity Examination by **another non-medical doctor**.[20] When Mr. Roxby did not attend the second FCE[21], Sun Life denied his appeal "based on the information already submitted." November 19, 1999 appeal denial [R. 29-30], p. 2, attached as **Exhibit S**. On April 14, 2000, the Social Security Administration determined that Mr. Roxby was totally disabled from any occupation as of August 7, 1998 due to bulging discs, central cord syndrome, low back sprain, and coronary artery disease. See, Social Security Administration Decision (attached as **Exhibit T**). This decision was based on the same evidence that had been submitted to Sun Life.

This suit was commenced to recover the benefits promised Mr. Roxby under the terms of the Sun Life disability plan.

*III. ERISA Standard of Review*

---

[20] See, Surveillance Request dated October 20, 1999 [R. 45.] and October 28, 1999 letter [R. 39.], attached as composite **Exhibit R**.

The basis of Mr. Roxby's claim is a wrongful termination of disability benefits

pursuant to a group long-term disability insurance plan, governed by 29 U.S.C. § 1001, et

seq. (ERISA). The decision to deny benefits under an ERISA plan is evaluated under

varying standards of review, depending on the express terms of the plan and factual

circumstances of the case.

> "Consistent with established principles of trust law, we hold that a denial
> of benefits challenged under § 1132 (a)(1)(B) is to be reviewed under a *de
> novo* standard unless the benefit plan gives the administrator or fiduciary
> discretionary authority to determine eligibility for benefits or to construe
> the terms of the plan."

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed. 2d 80
(1989); accord, Brown v. Blue Cross & Blue Shield, 898 F.2d 1556, 1559 (11th Cir.
1990).

The "burden of proving" that the plan contains the requisite discretionary

authority is on the plan administrator and any "ambiguity in the wording of the policy

should be resolved against [the insurer]". Kinstler v. First Reliance Standard Life Ins.

Co., 181 F.3d 243, 252 (2nd Cir. 1999); accord, Kearney v. Standard Ins. Co., 175 F.3d

1084 (9th Cir. 1999). The terms of a plan that are required to provide discretionary

authority to a plan administrator must be stated in **"express language"** that "is

**unambiguous in its design** to grant discretion regarding entitlements to the fiduciary or

administrator." Kirwan v. Marriott Corp., 10 F.3d 784, 789 (11th Cir. 1994)(emphasis

added)(holding that the language: "the trustees have the final authority to determine all

matters of eligibility for the payment of claims," is insufficient to grant discretionary

authority to the administrator).

> "Contrary to the argument of the insurance company that discretionary
> authority can be implied from the plan, the circuit courts which have
> found that particular ERISA plans granted discretion to plan

---

[21] The terms of the plan do not require Mr. Roxby to attend this type of examination, as discussed *infra*.

> administrators or fiduciaries, in cases decided after Firestone, have uniformly rested this finding upon **express language** of the ERISA plan before them. Indeed, this court has recently stated that the 'discretionary authority' to which Firestone refers must be **'expressly give[n]'** by the plan. Guy v. Southeastern Iron Workers' Welfare Fund, 877 F.2d 37, 38-39 (11th Cir. 1989)(finding requisite grant of discretionary authority where plan stated 'full and exclusive authority to determine all questions of coverage and eligibility' as well as 'full power to construe the provisions of [the] Trust' belonged to trustees); see also, Batchelor v. Int'l Broth. Of Elec. Workers Local 861 Pension & Retirement Fund, 877 F.2d 441, 443 (5th Cir. 1989)(grant of discretion found when plan stated 'full and exclusive authority to determine all questions of coverage and eligibility . . . [and] full power to construe the provisions' of the plan belonged to trustees); Boyd v. Trustees of United Mine Workers Health & Retirement Funds, 873 F.2d 57, 59 (4th Cir. 1989)(discretion found where plan expressly gave trustees power of 'full and final determination as to all issues concerning eligibility for benefits' and 'authorized [them] to promulgate rules and regulations to implement th[e] Plan'); Lowry v. Bankers Life & Cas. Retirement Plan, 871 F.2d 522, 524 (5th Cir. 1989)(plan's language that committee had authority to 'interpret and construe' plan and 'to determine all questions of eligibility and status under the Plan' constituted grant of discretionary authority"; Bali v. Blue Cross & Blue Shield Association, 873 F.2d 1043, 1047 (7th Cir. 1989)."

Moon v. American Home Assurance Co., 888 F.2d 86, 88-89 (11th Cir. 1989)(emphasis added).

The Sun Life Plan does not contain express language, unambiguous in its design,

to give Sun Life discretionary authority to determine eligibility for benefits or to interpret

the terms of the plan. Sun Life cites to several provisions of the plan that it purports

gives it the requisite discretionary language[22]. Of all the provisions cited, the closest any

of these provisions comes to granting discretionary authority is:

> "We may require proof in connection with the terms or benefits of this Policy. If proof is required, we must be provided with such evidence satisfactory to us as we may reasonably require under the circumstances."

Sun Life Plan [R. 488.], p. 20 (Exhibit A).

---

[22] See, Memorandum of Law in Support of Defendant's Motion for Summary Judgment, p. 14.

10

This language is not unambiguous in its design to grant discretionary authority.

See generally, Lee v. Blue Cross/Blue Shield of Ala., 10 F.3d 1547, 1551 (11th Cir.

1994)("[A]pplication of the rule of *contra proferentem* is appropriate in resolving

ambiguities in insurance contracts regulated by ERISA."). This provision does not

contain language granting "full and final authority to determine eligibility," or other

language to that effect. The provision does not even describe what type of proof is

required. The type of proof required must be expressly described to grant discretionary

authority.

> "But a more fundamental point than this fine distinction about wording is
> that **the word** 'satisfactory,' whether in the phrase **'satisfactory proof' or
> the phrase 'proof satisfactory to [the decision-maker] is an inadequate
> way to convey the idea that a plan administrator has discretion**. Every
> plan that is administered requires submission of proof that will 'satisfy' the
> administrator. **No plan provides benefits when the administrator
> thinks that benefits should not be paid! Thus, saying that proof must
> be satisfactory 'to the administrator' merely states the obvious point
> that the administrator is the decision-maker, at least in the first
> instance.** Though we reiterate that no one word or phrase must always be
> used to confer discretionary authority, the administrator's burden to
> demonstrate insulation from *de novo* review requires either language
> stating that the award of benefits is within the discretion of the plan
> administrator or language that is plainly the functional equivalent of such
> wording. Since **clear language can be readily drafted** and included in
> policies, even in the context of collectively bargained benefit plans when
> the parties really intend to subject claim denials to judicial review under a
> deferential standard, courts should require clear language and decline to
> search in semantic swamps for arguable grants of discretion."

Kinstler, 181 F.3d at 252 (emphasis added).

For example, the Sun Life Plan does not contain language such as: "proof of

claim 'must describe the event, the nature and the extent of the cause for which a claim is

made; it must be satisfactory to us'." Donato v. Metropolitan Life Ins. Co., 19 F.3d 375,

11

379 (7th Cir. 1994)(finding this language sufficient to grant discretionary authority in the

Seventh Circuit[23]).

> "We hold that the mere fact that a plan requires a determination of
> eligibility or entitlement by the administrator, or requires proof or
> satisfactory proof of the applicant's claim, or requires both a determination
> and proof (or satisfactory proof), does not give the employee adequate
> notice that the plan administrator is to make a judgment largely insulated
> from judicial review by reason of being discretionary. Obviously a plan
> will not--could not, consistent with its fiduciary obligation to the other
> participants--pay benefits without first making a determination that the
> applicant was entitled to them. The statement of this truism in the plan
> document implies nothing one way or the other about the scope of judicial
> review of his determination, any more than our statement that a district
> court 'determined' this or that telegraphs the scope of our judicial review
> of that determination. **That the plan administrator will not pay benefits
> until he receives satisfactory proof of entitlement likewise states the
> obvious, echoing standard language in insurance contracts not
> thought to confer any discretionary powers on the insurer.** When an
> automobile insurance policy provides that the insurer will not pay for
> collision damage save upon submission of proof of that damage, all it is
> saying is that it will not pay upon the insured's say-so; it will require
> proof. There is no reason to interpret an ERISA plan differently."

Herzberger v. Standard Ins. Co., 205 F.3d 327, 332 (7th Cir. 2000)(*opinion by*, Posner,
Chief Judge)(emphasis added)(holding that the language: "will pay the . . . BENEFIT
upon receipt of satisfactory written proof that you have become DISABLED" is
insufficient to grant discretionary authority).

Since the Sun Life Plan does not contain the requisite discretionary language

required by Bruch and Brown, the *de novo* standard of review must be utilized.

However, even if it were determined that the plan contains the requisite discretionary

language, the arbitrary and capricious standard of review would not apply to this case.

> "A determination that the arbitrary and capricious standard applies does
> not end the court's inquiry with respect to the appropriate standard of
> review, however, because the concept of arbitrary and capricious must be
> 'contextually tailored.' Brown v. Blue Cross & Blue Shield, 898 F.2d

---

[23] It is not evident that even this language would be sufficient to grant discretionary authority in this
Circuit. As discussed *supra*, the Eleventh Circuit requires an "express" grant of discretionary authority:
however, the Seventh Circuit in Donato held that no "explicit" grant of authority is required. Id. The
Seventh Circuit's decision is in conflict with established Eleventh Circuit precedent.

> 1556, 1564 (11th Cir. 1990). The Eleventh Circuit has identified a range
> of deference to be applied to an administrator's decision with a
> 'disinterested, impartial decisionmaker deserving the greatest deference'
> and fiduciaries with a serious conflict of interest being given slight, or
> even no deference, so that 'the decision, if wrong may be unreasonable.'
> Id."

Vann v. National Rural Electric Cooperative Assoc. Retirement and Security Program,
978 F.Supp. 1025, 1039, 1048 (M.D. Ala. 1997).

In this case, an inherent conflict of interest exists making application of the

heightened arbitrary and capricious standard applicable **if** discretionary language is found

because Sun Life is an insurance company.

> "In Brown, a panel of this court held that **the heightened arbitrary and
> capricious standard must be used when the plan was administered by
> an insurance company** which paid benefits out of its own assets.
> 'Because an insurance company pays out to beneficiaries from its own
> assets rather than the assets of a trust, its fiduciary role lies in perpetual
> conflict with its profit-making role as a business."

Buckley v. Metropolitan Life, 115 F.3d 936, 939 (11th Cir. 1997)(emphasis added).

JM Pontiac bought a long-term disability policy from Sun Life to cover its

employees. Sun Life is paid a set premium by JM Pontiac for making claims

determinations. The money for paying claims comes directly from Sun Life's assets.

This is also why Sun Life was concerned about the **"significant exposure [it] has**

**here**[24]**."** It is for this reason that there is a conflict of interest between Sun Life's profit

making role as a business and its fiduciary obligation to act solely in the interests of the

plan participants and beneficiaries[25].

> "The beneficiary need only show that the fiduciary allowed himself to be
> placed in a position where his personal interest might conflict with the
> interest of the beneficiary. It is unnecessary to show that the fiduciary
> succumbed to this temptation, that he acted in bad faith, that he gained an
> advantage, fair or unfair, that the beneficiary was harmed. Indeed, the law

---

[24] Exhibit F.
[25] 29 U.S.C. §1104 (a)(1).

13

> presumes that the fiduciary acted disloyally, and inquiry into such matters
> is foreclosed. The rule is not intended to compensate the beneficiary for
> any loss he may have sustained or to deprive the fiduciary of any unjust
> enrichment. Its sole purpose is prophylactic . . .
>
> In other words, one reason for limiting the deference when the fiduciary
> suffers a conflict of interest is to discourage arrangements where a conflict
> arises."

Brown, 898 F.2d at 1565 (citations omitted).

Once the determination has been made that a conflict of interest exists, the burden

shifts to the insurance company to prove that is decision was not tainted by this conflict[26].

> "[A] wrong but apparently reasonable interpretation is arbitrary and
> capricious if it advances the conflicting interest of the fiduciary at the
> expense of the affected beneficiary or beneficiaries unless the fiduciary
> justifies the interpretation on the ground of its benefit to the class of all
> participants and beneficiaries."

Godfrey v. Bellsouth Telecommunications, Inc., 89 F.3d 755, 758 (11th Cir. 1996).

Sun Life advanced its own interests at the expense of Mr. Roxby to the point

where it is entitled to little or no deference at all[27]. As will be discussed in detail, *infra*,

Sun Life's decision was wrong and it advanced Sun Life's interest in not paying claims

from its assets.

## IV. Sun Life's Failure to Conduct a Full and Fair Review

Sun Life has an obligation to conduct a full and fair review of every claim

submitted to it[28]. Sun Life had more than sufficient information in its possession to

---

[26] Id at 1566.

[27] Any argument by Sun Life that the failure to pay a valid claim would not advance Sun Life's interests because it would violate its obligations under the policy and subject it to needless litigation is ludicrous. Although Sun Life might incur its own attorney's fees, this amount would be offset by the amount of money made by investing the amount of benefits it should have been paying. In addition, certain people are afraid of the litigation process, do not or cannot endure the stress of litigation, cannot find an attorney who understands ERISA, etc. Furthermore, because there are no extra-contractual damages available under ERISA and attorney's fees are only discretionary, denial of a valid claim results in a windfall for Sun Life. When done over the course of thousands of claims, this amounts to millions of dollars.

[28] 29 U.S.C. § 1133; ERISA § 503.

determine that Mr. Roxby was disabled (discussed *supra*) and it did not have any

contrary medical evidence to support a denial. An ERISA plan administrator is required

to have some medical information in its possession that supports a denial of a claim

before it can actually deny the claim.

> "Plainly put, we will not countenance a denial of a claim solely because an
> administrator suspects something may be awry. Although we owe
> deference to an administrator's reasoned decision, we owe no deference to
> the administrator's unsupported suspicions. **Without some concrete
> evidence in the administrative record that supports the denial of the
> claim, we must find the administrator abused its discretion**."

Vega v. National Life Ins. Services, Inc., 188 F.3d 287, 1999 U.S. App. LEXIS 20894,
*46 (5th Cir. September 1, 1999)(emphasis added); accord, Motor Vehicle Mfrs. Ass'n v.
State Farm Mutual Auto Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed. 2d 443
(1983) (a decision is arbitrary and capricious if the decision-maker "entirely failed to
consider an important aspect of the problem, offered an explanation for its decision that
runs counter to the evidence before [it], or is so implausible that it could not be ascribed
to a difference in view or the product of agency expertise").

At best, Sun Life had an FCE and a TSA to contradict the conclusions of Mr.

Roxby's treating physician, who is a physiatrist and medical doctor specifically trained to

determine whether someone has the capability to work. Part of the obligation to conduct

a full and fair review is the concept of the treating physician rule. An ERISA plan

administrator is required to give deference to the conclusions of a treating physician.

> "Cases in this circuit distinguish among the opinions of three types of
> physicians: (1) those who treat the claimant (treating physicians); (2)
> those who examine but do not treat the claimant (examining physicians);
> and (3) those who neither examine nor treat the claimant (nonexamining
> physicians). As a general rule, more weight should be given to the
> opinion of a treating source than to the opinion of doctors who do not treat
> the claimant. At least where the treating doctor's opinion is not
> contradicted by another doctor, it may be rejected only for 'clear and
> convincing' reasons. We have also held that 'clear and convincing'
> reasons are required to reject the treating doctor's ultimate conclusions.
> Even if the treating doctor's opinion is contradicted by another doctor, the
> Commissioner may not reject this opinion without providing 'specific and
> legitimate reasons' supported by substantial evidence in the record for so

doing."

Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)(citations omitted); accord, MacGregor
v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)[29].

Sun Life did not have Mr. Roxby examined by a physician[30]. In Godfrey v.

Bellsouth Telecommunications, Inc., 89 F.3d 755 (11th Cir. 1996), the failure of the

administrator to physically examine the plan participant was held to be arbitrary and

capricious because "fibromyalgia can be severely disabling and can only be diagnosed by

an examination of the patient." Id at 758[31]. What is more disturbing is that Sun Life's

own adjuster stated that an Orthopedic IME was needed, but the exam was never

performed[32].

> "It seems to the court that the only rational explanation for the failure of
> the defendant's physicians to follow up on evidence which they did have
> and to ignore the effects of the medications that the plaintiff was taking is
> that they knew that in fact the plaintiff was disabled and following up
> leads and considering the effect of the medications would only confirm
> what any reasonable doctor would have already known."

Id at 759.

---

[29] Cases construing Social Security disability provisions should be used as guidance in ERISA cases.
Helms v. Monsanto Co., Inc., 728 F.2d 1416, 1420 (11th Cir. 1984); Pierce v. American Waterworks Co.,
683 F.Supp. 996, 1000 (W.D. Pa. 1988)(relying in part on Social Security Administration's determination
of disability in finding administrator's decision arbitrary and capricious). Also see, Isabel v. Hartford Life
and Accident Ins. Co., 1999 U.S. LEXIS 824, *6-7 (N.D. CA January 29, 1999)("As a general matter, the
opinion of a treating physician is accorded more weight than that of a non-treating physician. . . . In
addition, the opinion of a non-examining physician cannot, by itself, constitute substantial evidence to
overturn the opinion of either an examining physician or a treating physician. In rejecting Dr. Neuwelt's
diagnosis, neither Hartford's in-house nurse nor Dr. Kozin ever personally examined plaintiff. Further,
Hartford later declined to have plaintiff looked at by a physician of its own choosing. . . . Dr. Lifshay's
report thus amounts to an uncontradicted opinion which may be rejected only for 'clear and convincing'
reasons.").

[30] The fact that Mr. Roxby's records were **reviewed** by an in-house cardiologist has no relevancy to this
case because the cardiologist only reviewed Mr. Roxby's ability to work from a cardiac point of view while
specifically refusing to comment on the orthopedic or neurological problems because these were outside a
cardiologist's field. Furthermore, Mr. Roxby's cardiac problems were not the crux of his disability.

[31] Also see, Zervos v. Solo Cup Co., 520 N.E. 2d 823, 826 (Ill. App. 1987)(the decision was arbitrary and
capricious where the recommendation of the treating physician was not followed and the fiduciary ignored
the doctor's evaluation and asserted its own independent judgment of the medical records).

[32] See, Exhibit J.

16

The Eighth Circuit has also held that it is arbitrary and capricious to rely on a reviewing physician's opinion over the treating physician's opinion. Donaho v. FMC Corp., 74 F.3d 894, 901 (8th Cir. 1996)("where the reviewing physician's conclusions are contradicted by and examining physician and two treating physicians, reliance on the reviewing physician's conclusions 'seems especially misplaced' and constitutes an abuse of discretion"). A FCE and a TSA performed by non-physicians can never be used to contradict the conclusions of a specialist. A physical therapist, M.S. and rehabilitation counselor do not even have the medical background and/or qualifications of a nurse, yet Sun Life determined that these opinions held more weight than the opinion of a physiatrist who is a medical doctor with a specialty. If this were allowed, then an ERISA plan participant could never win a case where his benefits were challenged. Sun Life had no medical evidence to contradict the conclusions of Mr. Roxby's treating physicians. This decision cannot be upheld.

> "Specifically, the claim file does not contain any evidence showing that plaintiff is not disabled. Nor is there any evidence demonstrating that stress would not cause plaintiff to develop aneurysms or that stress would not prohibit plaintiff from performing his job duties."

Durr v. Metropolitan Life Ins. Co., 15 F.Supp. 2d 205, 214 (D. Conn. 1998).

Finally, the fact that the Social Security Administration has determined that Mr. Roxby is totally disabled from any occupation removes any doubt that Mr. Roxby is entitled to benefits. Contrary to Sun Life's position, this evidence is relevant and admissible[33], especially when the standard of review is *de novo*. See, Kirwan, 10 F.3d at 789-90 ("In [the Eleventh] circuit, a district court conducting a *de novo* review of an

---

[33] E.g., Kirwan, 10 F.3d at 790 n32.

Administrator's benefits determination is not limited to the facts available to the

Administrator at the time of the determination.").

### *V. Sun Life is Not Entitled to Examine Mr. Roxby by a Non-Physician*

The second reason Sun Life has argued that it was entitled to terminate Mr.

Roxby's was that Mr. Roxby did not attend the second FCE, so it upheld the decision

terminating benefits "based on the information already submitted[34]." Based on the

information in the administrative file, the previous FCE had not identified any gainful

employment that Mr. Roxby could engage in; therefore, Sun Life could not terminate

benefits based on this information[35]. However, Sun Life has stated that Mr. Roxby

breached the terms of the plan and this fact alone justifies its decision to terminate

benefits[36].

First, there is no provision in the plan that states that a failure to attend an

examination is grounds for terminating benefits[37]. The most Sun Life was allowed to do

was to make a determination without the second FCE, which did not support terminating

the claim, as discussed *supra*.

> "A key principle guiding our resolution of the Retirees' claim is that we
> must look to the plain language of the [ ] plan to determine whether the
> Trustees' interpretation of that plan is 'arbitrary and capricious.' We have
> consistently explained that 'trustees abuse their discretion if they . . .
> construe provisions of [a] plan in a way that clearly conflicts with the
> plain language of the plan.'"

Canseco v. Construction Laborers Pension Trust, 93 F.3d 600, 606 (9th Cir.
1996)(citations omitted).

---

[34] Exhibit S.

[35] See, Exhibit Q.

[36] See, Memorandum in Support of Defendant's Motion for Summary Judgment, p. 19.

[37] Sun Life's citation to two Florida cases is completely misplaced. Those cases were based on insurance policies governed by Florida State Law. Florida law has no applicability to this case. This is an ERISA governed plan and state law is preempted. E.g., Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987).

18

Second, even if the failure to attend the FCE was a breach of the terms of the plan, it was not a material breach. It is hornbook contract law that a breach must be material before it can affect a contract. The only way that a failure to attend the FCE could be material is if it could possibly have some bearing on the decision to terminate benefits. However, as discussed at length in the preceding section of this Response, an FCE could not be used to contradict the conclusions of Mr. Roxby's treating physicians; therefore, the failure to attend the FCE was of no effect and not material to Sun Life's decision.

Third, the provision that allows a participant to be examined cannot reasonably be interpreted to allow an examination by someone who is not a medical doctor. Mr. Roxby is required to be under "the regular care of a Doctor" to receive benefits[38]. The Sun Life Plan defines "Doctor" as:

> "A **physician** or **surgeon** licensed to **practice medicine** or osteopathy or any other licensed **practitioner**[39] required to be recognized for health insurance purposes under the law of the jurisdiction where treatment is received. In all cases, treatment must be within the scope of the Doctor's license."

Sun Life Plan [R. 476.], p. 8 (Exhibit A)(emphasis added).

> The Sun Life Plan does not state who may examine a plan participant.

> "We have the right to examine any person for whom a claim for benefit payment has been made and to do so as often as we may reasonably require."

Id [R. 488.] at 20.

---

[38] Sun Life Plan [R. 495.], p. 27 (Exhibit A).

[39] Practitioner is defined as: "one who practices a profession." Webster's New Collegiate Dictionary 896 (1981). A physical therapist does not practice a profession; physical therapists are no more professionals than yoga instructors or radiology technicians.

19

Reading these three sections together, the only reasonable interpretation that can be made is that Sun Life can only have Mr. Roxby examined by a medical doctor. Mr. Roxby is no more required to attend the examination by a physical therapist than he would be required to attend the examination by a Doctor of Mathematics. Even if the Sun Life Plan could be interpreted to require an examination by a non-physician, the interpretation allowing only an examination by a medical doctor is also reasonable. Therefore, applying the rule of *contra proferentem*, Mr. Roxby was not required to attend this examination and Sun Life could not terminate benefits on this basis. See, Lee, 10 F.3d at 1551 (ambiguities resolved in favor of plan participant even under the arbitrary and capricious standard of review).

## VI. Conclusion

Sun Life never intended on paying this claim for any length of time. It certainly did not intend on paying this claim for life and was intent on limiting its liability to the sixty-month own occupation period. Sun Life never had Mr. Roxby physically examined by a physician, but determined that a non-physician was better qualified than a specialist to determine Mr. Roxby's disability. If a non-physician can arbitrarily overrule medical doctors, then an insurance company would never have to pay a claim. Sun Life's other argument is equally deficient. Mr. Roxby cannot be punished for refusing to do something that he is not required to do. Sun Life's actions were arbitrary and capricious and its actions cannot be condoned.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed

this 3rd day of November, 2000 to: Mark Greenberg, Esq., Greenberg & Lagomasino.

P.A., 799 Brickell Plaza, Suite 700, Miami, FL 33131. Via Fax: (305) 379-6612.

THE WAGAR LAW FIRM
3250 Mary Street, Suite 207
Coconut Grove, FL 33133
(305) 443-7772 (T)
(305) 443-1969 (F)

BY: _____
JOHN P. MURRAY
FL Bar No. 975818



**Sun
Financial
Group** ᵗ
*Sun Life of Canada and affiliates*

One Sun Life Executive Park
Wellesley Hills, MA 02181

Tel (617) 237-6030

POLICY AMENDMENT

POLICY NUMBER: 96878

POLICYHOLDER: J.M. Family Enterprises, Inc.

AMENDMENT EFFECTIVE DATE: May 1, 1992

This policy is reissued from the Amendment Effective Date to reflect
the changes indicated below.

Amendment
Effective Date        Description of Change

May 1, 1992        grace period

Except as stated in this Amendment, nothing contained herein shall be
held to alter or affect any of the policy provisions, including any
prior amended policies, amendments, modifications, endorsements, or
riders thereto.

SUN LIFE ASSURANCE COMPANY OF CANADA

*John R. Gaul*

President

EXHIBIT A

ROXBY 0469

Amendment No. 1
Amendment Date May 1, 1992

Policy Specifications

| | | |
|---|---|---|
| Policy Number | - | 96878 |
| Policyholder | - | J.M. FAMILY ENTERPRISES, INC. |
| Effective Date | - | January 1, 1992 |
| Policy Anniversaries | - | January 1, 1993 and the same day of each subsequent year. |
| Premium Due Dates | - | The Effective Date and thereafter the 1st day of each month. |
| Currency | - | United States Dollars. |

Monthly Premium Rates
- - - - - - - - - - - - - - - - - - - -

| | Employees | Dependents |
|---|---|---|
| | - - - - - - - - - | - - - - - - - - - - |
| Insurance Benefits* | (for each Employee) | (for the insured Dependents of each Employee) |
| Long Term Disability | To Be Advised | ** |

* for benefit details refer to appropriate Benefit Provision
** means that the benefit is not in force

-02-

ROXBY 0470

Amendment No. 1
Amendment Date May 1, 1992

INDEX

|                                                | PAGE |
|------------------------------------------------|------|
| Action Against Us                              | 19   |
| Benefit Provisions                             |      |
|   Long Term Disability                         | 21   |
| Clerical or Mechanical Errors                  | 16   |
| Commencement of Insurance                      | 11   |
| Definitions                                    | 4    |
| Entire Contract                                | 16   |
| Examinations                                   | 20   |
| Experience Rating Refund                       | 15   |
| Facility of Payment                            | 19   |
| Gender                                         | 20   |
| Governing Law                                  | 20   |
| Grace Period                                   | 15   |
| Incontestability                               | 17   |
| Individual Certificates                        | 18   |
| Individual Termination of Insurance            | 12   |
| Insurance Data                                 | 16   |
| Minimum Benefit Provision Requirements         | 13   |
| Misstatement of Age                            | 16   |
| Notice of Claim                                | 18   |
| Payment of Benefits                            | 18   |
| Premium Adjustments                            | 14   |
| Premium Calculation                            | 14   |
| Premium Payments                               | 15   |
| Proof                                          | 20   |
| Proof of Age                                   | 16   |
| Proof of Claim                                 | 19   |
| Termination of Benefits Provision(s)           | 13   |
| Termination of Policy                          | 13   |
| Time of Payment                                | 18   |
| Workers' Compensation                          | 18   |

-03-

ROXBY 0471

Amendment No. 1
Amendment Date May 1, 1992

DEFINITIONS

Employer

The Policyholder or its subsidiaries Carnnett, Inc., Fidelity Warranty Services, Inc., Jim Moran & Associates, Inc., JMIC Life Insurance Corporation, J.M. Lexus, Joyserv Company, LTD, Petro Chemical Products, Southeast Industrial Equipment, Southeast Toyota Distributors, Inc., Toyota Distribution Center of Commerce, World Cars, Inc., World Omni Financial Corporation, WorldOmni Leasing Corporation, Youth Automotive Training Center, Automotive Distribution Group and J.M. Pontiac.

Employee

A person classified by the Employer as a permanent full-time employee who is scheduled to work at least 30 hours a week at the Employer's place of business or at some other site where the Employer requires him to be.

Employment

Performance of work as an Employee except that classification as an individual employed on a basis excluded above will be applied toward completion of an Employee's waiting period.

Waiting Period

The period of time during which an Employee must be in Employment before becoming eligible for the benefits provided by this Policy. The Waiting Period for this Policy is 12 months.

Actively at Work

An Employee is actively at work on any day in which he performs all the usual and customary duties of his occupation

-04-

ROXBY 0472

Amendment No. 1
Amendment Date May 1, 1992

DEFINITIONS

(continued)

Actively at Work
  (continued)

at the Employer's place of business or
at some other site where the Employer
requires him to be.  In the case of an
Employee who is not on a flexible
schedule of working hours, the Employee
must work for 6 hours or the scheduled
number of hours for that day, whichever
is longer.  In the case of an Employee
who is on a flexible schedule, he must
work the scheduled number of hours for
that day.

An Employee is deemed Actively at Work
on a scheduled non-working day if he was
Actively at Work on the immediately
preceding scheduled working day.

Termination of Employment

Termination occurs on the day a person
ceases to qualify as an Employee for
any reason.

However, the Policyholder, acting in
accordance with rules which preclude
individual selection, may deem that
Employment continues:

1.  for the period of the Employee's
    scheduled paid vacation, but not
    exceeding 3 months;

2a. for a period ending not later than
    12 weeks, (in any period of 365
    days) in which the Employee has
    been granted a Family or Medical
    Leave of Absence (per federal
    guidelines);

2b. unless otherwise provided by law,
    for a period ending not later

-05-

ROXBY 0473

Amendment No. 1
Amendment Date May 1, 1992

DEFINITIONS

(continued)

Termination of Employment
(continued)

than the last day of the calendar
month following the month in which
the Employee is temporarily laid off
or is granted a leave of absence for
any reason other than Illness or
paid vacation; or

3. for any period the Employee is
absent from work due to Illness.

Illness

Bodily injury, sickness, disease,
Pregnancy or mental infirmity.

Pregnancy

Childbirth, miscarriage, abortion and
conditions which result directly or
indirectly from any of these.

Totally Disabled

An Employee is totally disabled if he is
in a continuous state of incapacity due
to Illness which:

All Employees with annual Basic Earnings of $30,000 or greater

1. while it continues throughout the
Elimination Period and during the
following 60 months of incapacity,
prevents him from performing all of
the material duties of his regular
occupation;

2. while it continues thereafter,
prevents him from engaging in
any occupation for which he is or
becomes reasonably qualified by
education, training or experience.

All Other Employees

1. while it continues throughout the
Elimination Period and during the
following 36 months of incapacity,

90-DEF-LTD

ROXBY 0474

Amendment No. 1
Amendment Date May 1, 1992

DEFINITIONS

(continued)

Totally Disabled
(continued)

    prevents him from performing all of the material duties of his Regular Occupation; and

2. while it continues thereafter, prevents him from engaging in any occupation for which he is or becomes reasonably qualified by education, training or experience.

Partially Disabled

An Employee is Partially Disabled if he is in a continuous state of incapacity due to Illness which continues throughout the Elimination Period and thereafter prevents him from performing all of the material duties of his Regular Occupation on a full-time basis; but

a) he is engaged in Partial Disability Employment; and

b) his current earnings are at least 20% less per month than his Indexed Monthly Basic Earnings due to that same Illness.

Disabled or Disability

The condition of being either Totally Disabled or Partially Disabled.

Regular Occupation

The profession, trade, work or the means of earning a living in which the Employee was primarily engaged immediately prior to commencement of Disability.

-07-

ROXBY 0475

Amendment No. 1
Amendment Date May 1, 1992

DEFINITIONS

(continued)

Partial Disability
Employment

Partial Disability Employment is:

1.  a program in which an Employee
    engages in vocational training or
    period of work for the purpose of
    rehabilitation; or

2.  employment in which an Employee
    performs at least one of the material
    duties of his Regular Occupation or
    another occupation on a part-time or
    full-time basis.

Partial Disability Employment may begin
during the Elimination Period, but a
Partial Disability Benefit will not be
paid until completion of the Elimination
Period.

Doctor

A physician or surgeon licensed to
practice medicine or osteopathy or any
other licensed practitioner required to
be recognized for health insurance
purposes under the law of the
jurisdiction where treatment is received.
In all cases, treatment must be within
the scope of the Doctor's license.

Basic Earnings

All Annualized Salary and wages paid or
payable to an Employee by the Employer in
the calendar year prior to the current
year which are considered basic
compensation for the J.M. Family
Enterprises, Inc. Associates Profit
Sharing Plan purposes.  This includes any
before tax contributions by an Employee
to the Employer's plans involving IRS
qualified salary reduction.  Employer

ROXBY 0476

Amendment No. 1
Amendment Date May 1, 1992

DEFINITIONS

(continued)

| | |
|---|---|
| Basic Earnings<br>(continued) | contributions to any benefit plan are not included. |
| Insured Earnings | The Employee's monthly Basic Earnings excluding any portion of his Basic Earnings in excess of $35,000. |
| Indexed Monthly<br>Basic Earnings | The Employee's monthly Basic Earnings prior to his Disability adjusted on the first of the month following 12 calendar months of Partial Disability payments and each yearly anniversary thereafter. Each adjustment to the Indexed Monthly Basic Earnings is the lesser of 10% or the current annual percentage increase in the Consumer Price Index as published by the U.S. Department of Labor. |
| Gross Monthly Benefit | The Employee's Monthly Benefit prior to any reduction of Other Income benefits and Partial Disability Employment earnings. |
| Riot | Unlawful assembly, civil commotion, disorderly conduct and all other forms of disturbance of the public peace by three or more persons assembled together. |
| Participation in a Riot | Encouraging, promoting or taking part in a Riot, whether by signs, gestures, words or by distinctive devices which identify the person with the Riot. |

-09-

ROXBY 0477

Amendment No. 1
Amendment Date May 1, 1992

DEFINITIONS

(continued)

Plan Administrator

The person or organization designated by
the Policyholder to maintain the records
of the people insured under the Policy.

Office

Our office at One Sun Life Executive
Park, Wellesley Hills, Massachusetts
02181.

-10-

ROXBY 0473

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

Commencement of Insurance

Long Term Disability

Applicable to All Employees
(except Employees of
J.M. Lexus and J.M. Pontiac)

An Employee is insured on the first day
that the Employee is Actively at Work
after completion of the Waiting Period.

An Employee previously insured under this
Policy will not have to complete a new
Waiting Period if he rejoins the Employer
as an Employee within 6 months after
Termination of Employment. The Employee
will become insured on the first day that
the Employee is Actively at Work.

An Employee who declines for religious
or other reasons to be insured by signing
a refusal card, is insured on the date
his subsequent written request for
insurance and evidence of insurability
are approved by Sun Life.

Applicable to Employees
of J.M. Lexus and
J.M. Pontiac

An Employee is insured on the first day
that the Employee is Actively at Work:

1. after completion of the Waiting
   Period, if his written request is
   received on or before completion of
   the Waiting Period;

2. after the date his written request is
   received, if it is received within
   one month after completion of the
   Waiting Period;

3. after the date of approval by us of
   evidence of his insurability, if his
   written request is received later
   than one month after completion of

-11-

ROXBY 0470

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

(continued)


Commencement of Insurance
       (continued)

Long Term Disability              the Waiting Period.
    (continued)

                                  An Employee previously insured under this
                                  Policy will not have to complete a new
                                  Waiting Period if he rejoins the Employer
                                  as an Employee within 6 months after
                                  Termination of Employment, if his written
                                  request is received within one month
                                  thereafter.  The Employee will become
                                  insured on the first day that the
                                  Employee is Actively at Work.

Commencement of Insurance         If an insured Employee is not Actively
on Policy Amendment               at Work on the date the Policy is
                                  amended to provide increased or
                                  additional benefits, the Employee
                                  will be insured for the increased or
                                  additional benefits only when he is
                                  again Actively at Work.

Individual Termination            An Employee ceases to be insured on the
of Insurance                      earliest of:

                                  1.  the date of Termination of
                                      Employment;

                                  2.  the end of the period for which the
                                      last premium is paid to us for the
                                      Employee's insurance; or

                                  3.  the date of termination of the
                                      Policy.


-12-

**ROXBY 0480**

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

(continued)

Termination of Benefit
Provision

We may terminate:

any Benefit Provision on any Premium Due
Date because one or more of the Minimum
Benefit Provision Requirements is not
met. We will give the Policyholder 31
days' prior written notice.

Minimum Benefit Provision
Requirements

Requirement No. 1 - At all times at least
                    25 insured
                    Employees.

Requirement No. 2 - 100% of the
                    Employees who have
                    completed the
                    Waiting Period must
                    be insured.

Termination of Policy

This Policy will terminate:

1.  at the end of the applicable Grace
    Period if, at that time, any premium
    remains unpaid;

2.  if the Policyholder gives us a
    written notice that the Policy is to
    be terminated. The date of such
    termination will be the later of:

    (a)  the date specified in the
         notice; and

    (b)  the date we receive the notice
         at our Office, or

-13-

ROXBY 0481

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

(continued)

Termination of Policy
(continued)

3. on the date all Benefit Provisions
are terminated.

Premium Calculation

The premium due on the Effective Date and
on each subsequent Premium Due Date is
the sum of the monthly premiums for all
insured Employees based on our then
current Monthly Premium Rates.  The
Monthly Premium Rates shown in the Policy
Specifications are our current rates on
the Effective Date of this Policy.

We may change the Monthly Premium Rates
after January 1, 1994.  The change in
rates can only be made once in a policy
year, unless the terms of the Policy
change.  For other than policy changes,
we will give the Policyholder 31 days'
prior written notice.

Premium Adjustments

The additional premium for insurance that
increases or commences on a date other
than a Premium Due Date is payable from
the next Premium Due Date.

The premium for insurance that decreases
or ceases on a date other than a Premium
Due Date is payable until the next
Premium Due Date.

However, any change in premium due to a
policy change will take effect on the
date of change.  The proportionate charge
or refund will be made on the next
Premium Due Date.

-14-

ROXBY 0482

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

(continued)

Premium Payments

Premiums are to be paid at our Office by the Policyholder on or before the Premium Due Dates.

We are not required to receive payment of any premium other than in one sum or from anyone other than the Policyholder. We are not required to see:

1. that any amounts referred to as contributions by Employees are, in fact, contributed by Employees; or

2. that all or any amounts so contributed by Employees are applied to the payment of premiums.

Grace Period

If a premium, after the first premium, is not paid by its Premium Due Date, it may be paid by the Policyholder within 45 days after its Premium Due Date. The Policy continues in force during this grace period. If a premium is not paid by the end of the grace period, this Policy will terminate. In any event, premiums are payable for any period of time during which the Policy remains in force.

Experience Rating Refund

On the second and each subsequent Policy Anniversary an experience rating process is applied to this Policy. We allot to this Policy such amount, if any, as we determine to be available as a refund as a result of that process. We reserve the right to change the basis of that process. Any refund is paid in cash to the Policyholder.

-15-

ROXBY 0483

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

(continued)

Insurance Data

The Employer is to provide us with information about the Employees and their benefits. This information is limited to that required for the calculation of premiums and to ensure that Policy terms are fulfilled. We reserve the right to inspect pertinent records of the Employer.

Clerical or Mechanical Errors

No clerical or mechanical error by the Employer, the Plan Administrator or by us will cause insurance:

1. which should be in force, not to commence;

2. which should continue, to cease;

3. which should not be in force, to commence; or

4. which should cease, to continue.

Misstatement of Age

If the age of a person is misstated, factors affecting his insurance will be based on the true age. Refunds or charges will be made accordingly.

Proof of Age

We have the right to request proof of age for any person insured or entitled to benefits under this Policy. If proof is not provided, benefits will not be paid. Any benefits which later become payable will be based on the true age.

Entire Contract

Your entire contract with us consists of

-16-

ROXBY 0484

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

(continued)

Entire Contract
(continued)

the following:

1.  this Policy; and

2.  the Policyholder's Application, a
    copy of which is attached; and

3.  the applications, if any, relating to
    persons insured under the Policy.

All statements made in the applications
will, in the absence of fraud, be deemed
representations and not warranties.  No
statement of any person may be used to
contest the validity of the insurance
unless it is written and signed by him,
and a copy furnished to him or to his
Beneficiary.

Only our President, Actuary, Secretary or
one of our Vice Presidents can agree to
change the Policy or to waive any of its
provisions.  No change or waiver will be
valid unless endorsed on or attached to
the Policy.  No agent has authority to
change the Policy or to waive any of its
provisions.

Incontestability

Except for non-payment of premiums, the
Policy will be incontestable after it
has been in force for a period of two
years from the Effective Date.  No
statement relating to the insurability
of any person may be used in contesting
the validity of the person's insurance
after it has been in force for a period
of two years during his lifetime.

-17-

ROXBY 0485

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

(continued)

Individual Certificates

A certificate is issued by us to the Policyholder for delivery to each insured Employee. The certificate describes benefits payable and other essential information.

Workers' Compensation

This Policy does not replace or affect any Workers' Compensation or similar law.

Payment of Benefits

Survivor Benefits payable upon the death of an Employee are payable as set forth in the Long Term Disability Benefit Provision.

Benefits payable during the lifetime of the Employee will be paid to the Employee.

Facility of Payment

If the Employee is not able to give a valid release for benefit payments then we may make payment up to $5,000. The payment can be made to any person we consider capable of giving a valid release.

Time of Payment

Once we have received written Proof of Claim for benefits payable on a periodic basis, such payments will be made at the end of each benefit paying period as described in the Benefit Provision.

Notice of Claim

We must receive written notice of claim within certain time limits except for those arising from the death of an insured. The time limits for such

-16-

ROXBY 0486

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

(continued)

Notice of Claim
(continued)

notices are set forth in the respective
Benefit Provisions.

The written notice is to be given to us
at our Office. If it can be shown to us
that the notice could not be given within
the applicable period, then the notice
must be given as soon as reasonably
possible.

When we receive the notice of claim, we
will send forms for filing Proof of
Claim. If these forms are not sent to
the Employee within 15 days after we
receive the notice of claim, then written
proof of the nature and extent of loss
given within the time specified in the
Proof of Claim provision is deemed to
meet our requirements.

Proof of Claim

We must receive written proof of claim
within certain time limits except for
those arising from the death of an
insured. The time limits for such proofs
are set forth in the respective Benefit
Provisions.

The proof, which must be satisfactory to
us, is to be given to us at our Office.
If it can be shown that proof could not
be given within the applicable period, we
will not deny or reduce benefits payable.
However, proof of claim must be given
within one year after the date such proof
is due unless the Employee is legally
incompetent.

Action Against Us

No legal action may be brought on any

-19-

ROXBY 0487

Amendment No. 1
Amendment Date May 1, 1992

GENERAL PROVISIONS

(continued)

| | |
|---|---|
| Action Against Us (continued) | claim earlier than 60 days after a Proof of Claim is given.  No such action may be brought after the expiration of the applicable statute of limitations from the time written Proof of Claim is required to be given. |
| Examinations | We have the right to examine any person for whom a claim for benefit payment has been made and to do so as often as we may reasonably require. |
| Gender | In the context of this Policy, the use of "he", "his" and "him" refers to both males and females. |
| Proof | We may require proof in connection with the terms or benefits of this Policy.  If proof is required, we must be provided with such evidence satisfactory to us as we may reasonably require under the circumstances. |
| Governing Law | This Policy is governed by the laws of the jurisdiction where the Application was signed. |

ROXBY 0488

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

The amount of each Employee's Long Term Disability Benefit is based on the
following schedule:

| Classification | Amount of Net Monthly Benefit |
| --- | --- |
| All Employees | The lesser of: |

                                (1)  60% of monthly Basic Earnings;

                                (2)  70% of monthly Basic Earnings,
reduced by Other Income; or

                                (3)  $21,000.

In no event will the Net Monthly
Benefit be less than $50.

The maximum monthly benefit will be
increased each year as follows:

January 1, 1993 $21,500

January 1, 1994 $22,000

The Plan Maximum is determined on the
date your Disability occurs and will
be increased during your period of
Disability.

Reduction in Benefits

The Employee's Long Term Disability Benefit will be reduced by the sum of all
Other Income which may become available to the Employee from time to time,
during the period of Disability.

Other Income includes:

- any amount of disability income provided for the Employee under any
employer paid group insurance or group pre-payment plan including any
policy issued to the Employee as a result of his membership in an
association of any kind.

90-LTD(REV1)

-21-

ROXBY 0489

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

(continued)

- any amount of income, other than salary continuance benefits, provided for the Employee by the Employer for the same or subsequent disability. However, any amount of salary continuance benefits provided for the Employee by the Employer which would cause the aggregate of Other Income and the Net Monthly Benefit to exceed 100% of the Employee's monthly Basic Earnings will cause the Net Monthly Benefit to be reduced by such excess.

- any amount of income provided for the Employee by any other employer for the same or subsequent disability.

- any amount of income provided for the Employee under any employer paid retirement or pension plan; except that this shall not include any income from a profit sharing plan, a thrift plan, an individual retirement account (IRA), an individual retirement annuity, a tax sheltered annuity (TSA), a stock ownership plan or a non-qualified plan of deferred compensation.

- any amount of disability income provided for the Employee under any compulsory benefit act or law.

- any amount of income provided for the Employee and his dependents for his same or subsequent disability under the Social Security Act. Dependent benefits are not included if the Employee is divorced and the dependent benefits are being paid directly to the divorced spouse or to the children not in custody of the Employee.

- any amount of Old Age income provided for the Employee under the Social Security Act.

- any amount of income provided for the Employee under any Workers' Compensation, occupational disease, or similar law.

Other Income will be deemed to include any amount described above which would have been available to the Employee had he applied for such benefit.

Other Income will not include:

- any retirement benefits which reduce the normal retirement benefit accrued under the retirement plan.

- Social Security Old Age income payable to the Employee or his dependents if Disability commenced on or after the Employee's 70th birthday and

-22-

ROXBY 0490

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

(continued)

payment of Old Age Income began prior to the Employee's Disability date.

- any increase in the benefits under the Workers' Compensation Law, the Social Security Act, the Railroad Retirement Act, any Veteran's Disability Compensation and Survivor Benefits Act, or any similar Federal or State law, as amended subsequent to the date of commencement of such benefit, occurring while the Employee is receiving payments under this Long Term Disability Benefit Provision.

If a lump sum payment is provided to the Employee in substitution for or instead of any item of Other Income, the Employee shall be deemed to be receiving the monthly equivalent of the income to which he would have been entitled had there not been a lump sum payment, but not to exceed in total the amount of the lump sum payment.

Change in Coverage

Changes in the Amount of Net Monthly Benefit due to change in monthly Basic Earnings will occur on the date of change; except that any increase will become effective only if the Employee is then Actively at Work; otherwise on the date the Employee returns to Actively at Work status.

Coverage Ceases

Coverage for an Employee under this Benefit Provision ceases on the earliest of:
- the applicable Individual Termination of Insurance date;
- the date this Benefit Provision terminates for the Classification of Employees of which he is a member; or
- the date the Employee ceases to be eligible for this Benefit in accordance with the Classification shown in the schedule.

Elimination Period

The Elimination Period begins with the Employee's first day of Disability and ends after an uninterrupted Disability period of 180 days. No Benefit is payable during the Elimination Period.

If Disability during the Elimination Period ceases for 15 working days or less,

-23-

ROXBY 0491

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

(continued)


then the Disability will be treated as continuous. Any days that the Employee
is not Disabled will not be counted towards completion of the Elimination
Period.


Waiver of Premium

Premiums will be waived while the Net Monthly Benefit is being paid.


Maximum Benefit Period

The Net Monthly Benefit will continue for as long as the Employee is Disabled,
up to the Maximum Benefit Period set forth in the following schedule:

| Age at Date Disability Commenced | Maximum Duration of Benefits |
|---|---|
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 or over | 12 months |


A.  Total Disability Benefit

   If we receive due Notice and Proof of Claim that:
   - an Employee became Totally Disabled while insured; and
   - his Total Disability continued beyond the Elimination Period;

   we will pay, subject to the Limitations and the Exclusions, a Total
   Disability Benefit. The amount payable for each month of continuous Total
   Disability will be equal to the Net Monthly Benefit, based on the
   Employee's monthly Basic Earnings prior to his Disability. An amount equal
   to one-thirtieth of the Net Monthly Benefit is payable for each day of

-24-

ROXBY 0492

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

(continued)


A.  Total Disability Benefit
        (continued)

    Total Disability for a period which is less than a full month.

    Termination of Total Disability Benefit

    The Total Disability Benefit will cease on the earliest of the following
    dates:
    - the date the Employee ceases to be Totally Disabled; or
    - the date the Employee dies; or
    - the end of the Maximum Benefit Period.


B.  Partial Disability Benefit

    If we receive due Notice and Proof of Claim that:
    - an Employee became Partially Disabled while insured; and
    - his Partial Disability continued beyond the Elimination Period;

    we will pay, subject to the Limitations and the Exclusions, a Partial
    Disability Benefit.  The amount payable for each month of continuous
    Partial Disability will be equal to the Benefit as shown below, based
    on the Employee's monthly Basic Earnings prior to his commencement
    of Disability.  An amount equal to one-thirtieth of the Partial Disability
    Benefit is payable for each day of Partial Disability for a period which
    is less than a full month.

    During the first 24 months of Partial Disability after completion of the
    Elimination Period, the monthly Partial Disability Benefit will be equal to
    the Net Monthly Benefit.  This amount will not be reduced by any Partial
    Disability Employment earnings unless the Employee's total monthly income
    arising from the sum of the Net Monthly Benefit, income from Partial
    Disability Employment and any income from sources referred to as Other
    Income, exceeds 100% of his Indexed Monthly Basic Earnings.  If the
    Employee's total monthly income exceeds 100% of his Indexed Monthly Basic
    Earnings, his Partial Disability Benefit will be reduced by such excess.

    After Partial Disability Benefits have been paid for 24 months, the amount


-25-

ROXBY 0493

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

(continued)

B.   Partial Disability Benefit
        (continued)

of the Employee's monthly Partial Disability Benefit will be based on the
following formula:

(A divided by B) multiplied by C

Where:

A = The Employee's Indexed Monthly Basic Earnings minus any income received
     from his Partial Disability Employment.

B = The Employee's Indexed Monthly Basic Earnings.

C = The Net Monthly Benefit as determined in the Schedule.

Termination of Partial Disability Benefit

The Partial Disability Benefit will cease on the earliest of the following
dates:
 - the date the Employee ceases to be Partially Disabled; or
 - the date the Employee dies; or
 - the end of the Maximum Benefit Period; or
 - the date the Employee's current earnings from Partial Disability
   Employment exceeds 80% of his Indexed Monthly Basic Earnings; or
 - the date the Employee fails to provide adequate employment earnings
   information or proof of continuing Partial Disability as requested.

C.   Time Limits for Notice and Proof of Claim

The time limits for due Notice and Proof of Claim are:

Notice of Claim - not later than 30 days before the end of the applicable
                Elimination Period or, if earlier, within 30 days of the
                termination of this Benefit Provision.

Proof of Claim - not later than 90 days after the end of the applicable

-26-

ROXBY 0494

Amendment No. 1
Amendment Date May 1, 1992

## LONG TERM DISABILITY BENEFIT PROVISION

(continued)

C.  Time Limits for Notice and Proof of Claim
             (continued)

Elimination Period.

D.  Successive Periods

Successive periods of Disability after the Net Monthly Benefit had become payable will be considered a single period if, in the interval between the successive periods, the Employee was Actively at Work for less than:

- six consecutive months - if due to the same or related causes; or
- one day - if due to an entirely unrelated cause.

In such cases there will be no new Elimination Period.  Also, the amount of the Employee's Long Term Disability Benefit will be:

- based on the Employee's monthly Basic Earnings at the time of his initial Disability; and
- payable, in total, for no longer than the Maximum Benefit Period at the time of his initial Disability.

E.  Limitations

No Disability benefit is payable for:

1.  any period during which the Employee is not under the regular care of a Doctor.

2.  a Disability which is due, directly or indirectly, to a nervous, mental, psychological, emotional or behavioral disorder, unless:

    (i)  for the first 24 months after the date the Employee completes his Elimination Period, the Employee receives medical treatment for the Disability (mental or medical examination alone not being considered treatment) from a Doctor qualified to certify that

-27-

ROXBY 0495

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

(continued)

E. Limitations
   (continued)

such treatment is medically necessary; and

(ii) after the 24 months referred to in (i) above, the Employee is
confined in a medical facility licensed to provide psychiatric
treatment.

3. a Disability which is due to abuse of drugs or alcohol, unless:

   (i) a) the Employee is confined in a medical facility licensed to
          provide drug or alcohol treatment or is satisfactorily
          participating in a program of rehabilitation acceptable to
          us; and

       b) the confinement in a medical facility licensed to provide
          drug or alcohol treatment or participation in the program of
          rehabilitation deemed appropriate by us began during his
          Elimination Period; or

   (ii) there is also organic disease present which would cause
        Disability if the use of drugs or alcohol ceased; or

   (iii) the abuse of drugs originated out of the treatment of an
         otherwise covered condition.

4. a Disability which is due to or results from a pre-existing condition
   that begins in the first 12 months after the Employee's effective date
   of insurance, unless he has received no treatment of that condition for
   3 consecutive months ending while insured.

   "Treatment" means consultation, care or services provided by a Doctor,
   including diagnostic measures and taking prescribed drugs and
   medicines.

   "Pre-Existing Condition" means an Illness for which the Employee
   received treatment within 3 months prior to the Employee's effective
   date of insurance under this Policy.

-28-

ROXBY 0496

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

(continued)

E.  Limitations
   (continued)

However, if the Employee was insured under the Employer's previous
long term disability policy on the date prior to the Effective Date
of this Policy and was Actively at Work and insured under this Policy
on the Effective Date, then a Benefit would be payable if the Employee
had satisfied the pre-existing condition limitation under the Employer's
previous long term disability policy, or would have satisfied such
pre-existing condition limitation giving consideration towards
continuous time insured under both policies.  The benefit payable will
be the lesser of:

- the benefit otherwise payable under this Policy; and
- the benefit which would have been payable had the previous policy
  remained in force.

Recommencement of Insurance - If an Employee returns to work and
becomes insured again, such Employee will be subject to this Limitation
with respect to any Illness which began during the period of time
between his termination of insurance and recommencement of insurance,
as if his insurance commenced for the first time.

F.  Exclusions

Payment will not be made for a Disability which is due to or results from:

- war (declared or undeclared) or active duty in any armed service during
  a time of war;

- Participation in a Riot, rebellion, or insurrection;

- intentionally self-inflicted injuries, or attempted suicide; or

- commission or attempted commission of a criminal offense.

-29-

RCXBY 0497

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

(continued)

G.  No Loss/No Gain

An Employee who is not Actively at Work due to Illness on the Effective
Date of this Policy will be covered under this Policy if:

1.  he was insured under the Employer's previous long term disability policy
    on the date prior to the Effective Date of this Policy; and

2.  he is a member of an eligible classification of Employees.

The benefit payable will be the lesser of:

- the benefit otherwise payable under this Policy; and
- the benefit payable under the Employer's previous group long term
  disability policy less any benefits payable under that policy.

H.  Amendment or Termination of Benefit Provision

With one exception, an Employee's rights to benefits under this Benefit
Provision are determined on the date the Disability commenced.
These rights are subject to the terms of this Policy and will not be
affected by subsequent amendment or termination of this Benefit Provision.
The exception is "Successive Periods" will not apply after termination of
this Benefit Provision.

I.  Survivor Benefit

1.  Amount of Benefit

    The amount of the Employee's Survivor Benefit is based on the following
    schedule:

    Classification                Amount of Benefit

    All Employees                 An amount equal to 3 times the Employee's
                                  last Gross Monthly Benefit payable in
                                  3 equal monthly installments.

-30-

ROXBY 0498

Amendment No. 1
Amendment Date May 1, 1992

LONG TERM DISABILITY BENEFIT PROVISION

(continued)

I. Survivor Benefit
    (continued)

   2. Payment of Benefit

      If we receive Due Proof that the Employee dies as a result of the
      Disability for which we were paying a Long Term Disability Benefit,
      then the Survivor Benefit is payable.  Payment will be made to the
      Employee's surviving Spouse, to the oldest living Dependent Child
      under age 21 (23 if a full-time student wholly dependent on the
      Employee for support), or to the Employee's estate.

   3. Limitations

      No benefit is payable if, at the date of the Employee's death:

      a)  he had not been continuously Disabled for at least 6 months
          immediately prior to his death;

      b)  this Provision is not in force.

90-LTD(REV1)F

-31-

ROXBY 0499

ROXBY, BRUCE          CONSULTATION
JUNE 14, 1993

CHIEF COMPLAINT: Neck and back pain.

HISTORY OF PRESENT ILLNESS: Patient is a 46 year old white male
who is an auto mechanic and was working under a car when he went to
stand up hitting his head on a tire on 5/23/93. He reports that he
immediately felt a burning sensation in his neck as well as
tingling in the right upper extremity. He has history of neck and
left upper extremity pain since being involved in a motor vehicle
accident approximately five years ago. The right upper extremity
tingling, however, was a new sensation. Patient had an MRI
performed at Hollywood Diagnostic Center which reportedly showed
bulging C6-7 disk. In addition, patient complains of increasing
low back pain since the accident. He states that any turning
motion increases the pain. He states that riding in a car is
difficult as bumps also increases the pain. He describes some
aching sensation in his left thigh particularly in the posterior
aspect. He reports that he is having frequent headaches since the
accident. He also complains of numbness in the 4th and 5th digits
of the right hand as well as all five digits of the left hand. He
attempted to return to work on light duty but had to discontinue
due to the pain. He denies any bladder or bowel dysfunction.

PAST MEDICAL HISTORY: Motor vehicle accident 5 years ago with C6-7
herniated disk per MRI with multiple bulging disks. Patient with
residual neck and left arm pain.

ALLERGIES: IVP dye.

SOCIAL HISTORY: Patient is married with four children. He is
employed as an auto mechanic.

CURRENT MEDICATIONS: Darvocet N100, 4 to 5 tablets over the last
three weeks and Anacin 3 bid.

PHYSICAL EXAMINATION: Patient is a middle aged white male
appearing to be in discomfort. He is alert and oriented x 3. Head
is in an anterior position. He has diffuse tenderness to palpation
over the trapezius muscles bilaterally and the cervical paraspinal
muscles. He has several tender points particularly in the
intrascapular region. Shoulder ROM is WNL's. Scapular thoracic
movements is normal. Spurling's maneuver produces neck pain but
does not cause radicular symptoms. Radial pulses are easily
palpable and do not diminish with Addson's maneuver. Muscle
stretch reflexes are symmetrical for biceps, triceps,
brachioradialis, knees and ankles. Cervical spine ROM is WNL's
except rotation to the right which is limited at the end range by
pain. Lumbosacral spine ROM is limited with forward flexion to 45
degrees. Extension combined with rotation to the left produces

ROXBY 0296

EXHIBIT B

ROXBY, BRUCE
PAGE TWO

severe back pain complaints.  Patient has minimal tenderness to
palpation over the left lumbosacral paraspinal muscles.  Muscle
strength is 5/5 throughout the BLE's.  Muscle strength is also 5/5
throughout the UE's with the exception of ulnar deviation of the
4th and 5th digits which is 4+/5.  Sensation is grossly intact
throughout all four extremities.  Straight leg raising test is
negative in the sitting and supine position.  Patient does have
significant tightness of his hamstring muscles bilaterally.
Babinski's examination reveals downgoing toes bilaterally.  Tinel's
sign is negative over both the median and ulnar nerves bilaterally.

IMPRESSION:
1.  Myofascial syndrome.
2.  Cervical strain.
3.  Probable left lumbar facet syndrome.
4.  Probable right ulnar neuropathy.

PLAN:
1.  Patient will be started on Orudis for it's anti-inflammatory
and analgesic properties.   The side effects of Orudis were
explained to the patient including GI upset and possible GI
bleeding.  Patient was instructed to discontinue the medication if
he develops any adverse side effects.
2.  Patient will be started in a physical therapy program to work
on pain reduction through anti-inflammatory modalities.  He will
then work on improving ROM and flexibility.   He will work on
improving his posture including head position.   He will be
instructed in proper body mechanics and a home exercise program to
prevent recurrent injuries.
3.   If patient is not showing significant improvement EMG/NCS
should be obtained to R/O right ulnar neuropathy vs radiculopathy.
4.  I will see the patient back in 3 to 4 weeks to reassess his
status.

Alan K. Novick, M.D.

AKN/dr



SunLife
of Canada

One Sun Life Executive Park
Wellesley Hills   MA 02181

Telephone 111 1111

Headquarters Office

February 11, 1994

J. M. Family Enterprises Inc.
Karen Davis
8019 Bayberry Road
Jacksonville, FL 32256

RE: Group Policy Number: 96878 -GD- Long Term Disability
    Employee Name: Bruce Roxby

Dear Ms. Davis:

We are pleased to advise that the above claim has been approved for
disability benefit payments. Details are as follows:

| | |
|---|---|
| Monthly Gross Benefit | $2,976.60 |
| Workers' Comp. Offset | $1,841.67 |
| Total Offset | $1,841.67 |
| Net Monthly Benefit | $1,134.93 |

Benefits accrue from November 22, 1993; the regular due date is the last
day of each month.

The first check will be issued shortly. This will be in the amount of
$2,584.29 with a FICA withholding of $26.05. FICA will be withheld
through November 30, 1993. The first check will pay through January 31,
1994.

Please send us a copy of the Social Security Disability/Retirement award
or denial as soon as it becomes available, in order that we may correctly
recalculate the benefit. In the event of a disability award, please
forward the Dependent awards also.

Future checks will be issued shortly before the due date each month while
we are furnished with satisfactory evidence of the claimant's continuing
total disability, and he/she otherwise continues to qualify for these
benefits. You will be notified when further evidence is required.

Sincerely,

Susan Marcelonis
Claims Administrator
Group L.T.D. Claims
SC 3208

SM/gem

cc: Bruce Roxby

ROXBY 0418

EXHIBIT C

ROXBY, BRUCE                FOLLOW UP EVALUATION
AUGUST 11, 1993

Patient returns today for a follow up appointment. He reports he
is sleeping better since starting the Elavil but has not noticed
any significant changes in his pain. He still states that most of
his pain is in his upper back particularly between his shoulder
blades with some radiation down the RUE. He states that his
headaches are unchanged.

PHYSICAL EXAMINATION:  Patient is a middle aged white male who
appears to be in mild discomfort. He is alert and oriented x 3.
He has diffuse tenderness to palpation over the trapezius muscles
bilaterally. Shoulder ROM is WNL's. Spurling's maneuver produces
neck pain bilaterally but does not produce radicular symptoms.
Muscle stretch reflexes are symmetrical. Strength is 5/5 with the
exception of the right 4th and 5th digits where ulnar deviation is
4 - 4+/5.

IMPRESSION:
1.  Myofascial pain syndrome.
2.  Probable right ulnar neuropathy.

PLAN:
1.  I would like the patient to continue on the Elavil as he is
showing some improvements with his sleep pattern.
2.   As the patient has not shown any significant benefit with
therapies it will be discontinued at this time.
3.   I have scheduled the patient for an EMG/NCS to R/O cervical
radiculopathy vs ulnar neuropathy.  If the patient shows acute
cervical  radiculopathy  he  will  be  considered  for  further
intervention including oral steroid medication.

_____
Alan K. Novick, M.D.

AKN/dr

ROXBY 0299

EXHIBIT D

ROXBY, BRUCE              FOLLOW UP EVALUATION
DECEMBER 8, 1993

Patient returns today for a follow up appointment and to assess his
impairment rating. He reports there is no change in his pain. He
continues to complain of both upper and lower back pain. He states
that the pain radiates down the upper extremity to the fourth and
fifth digits. He denies any radiation of the pain to his LE's. He
denies any bowel or bladder dysfunction. He reports that standing
for any length of time greatly aggravates his pain.

PHYSICAL EXAMINATION: Patient is a middle aged white male in no
acute distress. He is alert and oriented x 3. He has diffuse
tenderness to palpation of the lumbar paraspinal muscles
bilaterally with increased paraspinal tone. Lumbar spine ROM is
limited to approximately 30 degrees of forward flexion due to pain.
Patient also has significant pain with extension combined with
rotation to the left. He has no pain with rotation to the right.
Cervical spine ROM is essentially WNL's with the exception of
rotation to the right which is limited to 30 to 35 degrees.
Strength is generally 5/5 in all four extremities. Muscle stretch
reflexes are symmetrical throughout all four extremities.
Sensation is grossly intact with the exception of both the palmer
and dorsal aspects of the fourth and fifth digits of both hands
extending to the wrist.   The sensory examination however is
somewhat inconsistent. He is ambulating independently without any
assistive devices with a fairly normal gait pattern. There is no
antalgic gait. Straight leg raising test is negative. Spurling's
maneuver is negative.

IMPRESSION:
1.   Myofascial pain syndrome.
2.   Left lumbar facet syndrome.

PLAN:
1.   Patient continues to refuse lumbar facet injection which I
believe would benefit his low back pain. He should continue with
lumbar flexibility exercises.   He should also continue with an
aerobic conditioning program including riding an exercise bike or
walking briskly.
2.   I believe at this time the patient has reached MMI.  Based on
the Minnesota Disability rating scale, patient receives a
percentage of impairment of 17.5%  He receives a rating of 14% for
"neck and specific radicular pain present with objective neurologic
findings and x-ray, or CT, or myelogram, specifically positive for
herniated disk and no surgery performed", and 3.5% for "pain
associated with rigidity (loss of motion or postural abnormality)
or chronic muscle spasm.  The chronic muscle spasm or rigidity is
substantiated by objective clinical findings but without associated
demonstrable degenerative changes".

Alan K. Novick, M.D.

ROXBY 00

EXHIBIT E

**SunLife**
**of Canada**
A member of Sun Financial Group

Memorandum

Date 3/7/94

To      Janice Fishbein, GENEX Services

From    Bill Harney, Rehabilitation Consultant

Re      Bruce Roxby, JM Family Enterprises
        96878-GD

---

Please conduct an initial vocational evaluation at claimant's residence.
Determine motivation and return to work plans of claimant. Has he discussed
RTW with his employer? What are his thoughts about RTW in general?

There are many "unknowns" associated with this case. Because of the
significant exposure Sun Life has here it is important that all potential RTW
efforts be explored. Please bear that in mind when working this case.

The claimant is receiving Workers Compensation of $1841. mo. His net LTD
benefit is $2446. If he settles his WC then he will receive almost $4300. mo.
from Sun Life. This is a 5 yr. own occ. policy.

Have Drew review the file and then call me prior to contacting the claimant

3/38
No response from clmt.
Drw will contact ER. Conduct job analysis

ROXBY 0015

EXHIBIT F

## RECORD OF TELEPHONE CONVERSATION

Phone ☐          In Person ☐                Incoming ☐              Outgoing ☒

Certificateholder _Bruce Roxby_              Spoke With _Karen Davis_

Employer's Name _____              Branch/Address _____

Policy No.(s) _96578-GD_

_____                     Phone Number ( 704 ) 443-____ 7

Soc. Sec. # _____                  Claim # _____

In Reference To   Staff ☐    Seagram ☐    LTD ☒    Excess Risk ☐    Conversion ☐

Dental ☐   WI ☐   Other _____

Insured ☐   Dependent ☐   Name _____

Message _Called re. insured's light duty work —_
_They have nothing for him to_
_return to. He is not_
_qualified for any office work_

☐ Reply no later than: _____

**Received By**

Name and Section _____

Date _____              Referred To _____

Time _____              Date _____

H.I.CL 70403 (20M-11-92) 69686

ROXBY 0420

EXHIBIT G

VOCATIONAL REHABILITATION REVIEW FORM

NAME: _Bruce Roxby_ GROUP POLICY #: _96878_

ADDRESS: _5255 E 10th Cove, Deerfield Beach FL 33441_

TELEPHONE #: _305-427-8733_ ANY OCC DATE: _11-22-98_

D.O.B.: _4-25-47_ AGE: _46_ D.O.D.: _5-26-93_ STATUS: M S D

LTD BENEFIT: _$3675.78 (6126.29)_ POLICYHOLDER: _J M Family Enterprise_

OCCUPATION: _Auto mech._ DATE OF EMPLOYMENT: _____

DIAGNOSIS: _1) Lumbar Facet Syndrome Myofascial Pain Syndrome_

LIMITATIONS: _light duty no heavy lifting, frequent positional changes._

WORK COMP: _____ MVA: _____

SOCIAL SECURITY #: _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_ SSDI STATUS: _____

SSDI AWARD: _____ _12gnd_
_highly skilled auto mech._

V.R. POTENTIAL:  Poor  1  2  ③  4  5  Excellent     REVIEW DATE: _3-2-94_

COMMENTS - ACTION TAKEN: _Hartford Ins. Beth Ann Irwin adjuntr_
_305 958 9302 Drew West Jackson_ _(904) 398-0345_
_FT. LAUDERDALE_

_according to ER, client has verbally requested w/c settlement._

_535C 81041_
_super. Karen Schaffer_

V.R. VENDOR: _____ REFERRAL DATE: _____

REHABILITATION CONSULTANT: _W.C. Xan_

ROXBY 0016

EXHIBIT H

GENEX  vices, Inc.
6499 NW 9th Avenue
Suite 312  Fort Lauderdale, FL 33309
305-938-9302   fax: 305-491-2427



MAY - 3 1994

OCATION
EHAB    ATION

April 14, 1994

Bill Harney
Sun Life of Canada
One Sun Life Executive Park
Wellesley Hills, Ma. 02181

RE:  Claimant  :  Bruce Roxby
     Claim #    :  96878
     GENEX #    :  333 3840
     Employer   :  LM Family Enterprises
     Date/Event:  5/26/93

## CLOSURE     REPORT

### OVERVIEW

Staff of J.N. Pontiac state an inability to modify or offer
Mr. Roxby a position based on his physical capabilities and
restrictions.

The carrier has requested file closure.

### CONTACTS

| | | | |
|---|---|---|---|
| 4/5/94 | Contact Sun Life of Canada | N/C | |
| 4/6/94 | Visit J.M. Pontiac | .8 | 1.2 |
| 4/11/94 | Contact Sun Life of Canada | N/C | |
| 4/14/94 | Report | .5 | |

### DATA

On 4/5/94, detailed phone message was left with Bill Harney
of Sun Life regarding the upcoming appointment with J.M.
Pontiac.

On 4/6/94, I travelled to Hollywood, Florida, and met with
Mr. Diaz, Tom Ryles, and Ms. Kelly, Personnel Officer.  The
request by Sun Life for a meeting with J.M. Pontiac staff in
order to assess if a position could be modified based on Mr.
Roxby's physical capabilities and limitations was discussed
with staff.  Ms. Kelly stated that due to Mr. Roxby's

VR case closed. Client not cooperative. ER cannot accomodate
Policyholder in a ... position.          S Marcelon   MAY 0 5 1994

ROXBY 0401

EXHIBIT 1

ROXBY   4/14/94
PAGE 2

physical restrictions on posture changes (ability to
frequently and at will stand as needed), J.M. Pontiac was
unable to develop a modified position for Mr. Roxby.  Ms.
Kelly went on to explain that attempts had been made to
return Mr. Roxby to J.M. Pontiac in a modified position.  Ms.
Kelly assessed that the position of service writer would be
too physically demanding as this position with J.M. Pontiac
does require constant and walking, and sitting is not
involved.  Ms. Kelly stated that she had also looked into Mr.
Roxby's returning as a porter.  She assessed that the porter
position, which involves heavy lifting, sweeping, and
performing other duties as needed, would be too heavy for Mr.
Roxby.  Mr. Roxby's occupation as a mechanic could not be
modified to allow him to sit as needed.

Ms. Kelly explained that she did not have in her possession
medical records dictated from Mr. Roxby's physician and his
physical capabilities had been discussed with her through
conversations with Sharon Chappel and Karen Davis, Risk
Manager with JM Family Enterprises.  According to Ms. Kelly,
Mr. Roxby's workers compensation claim has not been settled.

On 4/11/94, spoke with Bill Harney of Sun Life.  Information
received during the meeting with JM Pontiac staff was
discussed at length.  File closure was recommended.  Mr.
Harney was advised that this file could be reopened at any
time if Mr. Roxby's status changes.

ANALYSIS AND PLANNING

Mr. Roxby had previously declined to meet with me in order to
undergo a vocational evaluation.  JM Pontiac staff has
already discussed the possibility of Mr. Roxby returning to
work there in a modified position.  Staff has assessed that a
position with JM Pontiac cannot be modified based on Mr.
Roxby's physical restrictions of no heavy lifting and
frequent changes in position.

This file will be closed as requested by the carrier and can
be reopened if Mr. Roxby's status changes or if other
rehabilitation services are warranted.

RECOMMENDATIONS

1.  Provide file closure.

ROXBY   4/14/94
PAGE 3


Respectfully submitted,

*Dru West Jackson*          SIGNED IN ABSENCE

Dru West Jackson, MA,CRC,CCM
Rehabilitation Counselor

DWJ/mk

ROXBY 0403

EE called our Group Service Dept and I received a message to call him back. EE was very upset. He told me he did not have a Functional Capacity Exam in June 25, 1996 and I told him we have not suspected security but have stored medical records from Dr. Perkins. He was very upset with Sun Life's handling of his claim (Note: EE collects $4,182.29 monthly). I told him every claim is subject to periodic renew and his claim needs more clarification.

WATCH THIS CLAIM CLOSELY! I see no reason why this claim should be paid anymore. EE is a 60 mon Own/Occ = Nov 30, 1998. Please advise.                    R. Johnson NOV 2 2 1996

Get recs and send for orthopedic IME
See Karen 11/25/ for Surveillance

ROXBY 0288

EXHIBIT J

claims

Although claimant may be able to do sedentary work, it is clear he has no plans to do so. Hers work hx., may not be easy to terminate at any occ. Suggest developing POA to assess current treatment and functioning levels. change date = 11/97.

N Harney AUG - 7 1997

ROXBY 0266

EXHIBIT K

# *EmpNet™ F.C.E. Summary*

Patient Name: Bruce Roxby

Date of Evaluation: 11·19·98

1. How would you rate this patient's effort?

   ☐ Invalid    ☐ Lack of effort exhibited, but test results remain valid    ☒ Valid

2. A) Was the examinee's job description provided?    ☐ Yes  ☒ No
   B) If yes, can the examinee return to pre-injury job demands?    ☐ Yes  ☐ No
   C) If the answer to "2. B)" is "No," can examinee return to pre-injury job
      with modified duty?    ☐ Yes  ☐ No
   D) At what physical demand level can examinee work?
      ☐ Sedentary  ☐ Light  ☒ Medium    ☐ Heavy    ☐ Very Heavy

3. What is the workday tolerance level for this individual?
   ☒ 8    ☐ 7    ☐ 6    ☐ 5    ☐ 4    ☐ 3    ☐ 2    ☐ 1  Hours

4. What issues, if any, have been uncovered during this F.C.E. that would prevent this individual from returning to work or normal activity? Under Cardiologist care for coronary artery disease - diagnosed 6/98. Cardiologist did clear him for FCE evaluation.

5. A) Were the patient's stated reports and demonstrated behaviors
      consistent with one another?    ☒ Yes    ☐ No
   B) Were the patient's stated reports and demonstrated behaviors
      consistent with the presenting diagnosis?    ☒ Yes    ☐ No
   C) Were the patient's stated reports and demonstrated behaviors
      consistent with the activities being performed?    ☒ Yes    ☐ No

6. Check any outside influences present during the F.C.E. that may alter or interfere with this data.
   ☐ Therapist coaching    ☐ 3rd party present    ☐ Attorney involvement    ☐ other _____

7. Were there any inconsistencies demonstrated throughout this F.C.E.
   that should be identified and addressed?    ☐ Yes  ☒ No
   If Yes, please explain _____

8. Was inappropriate illness behavior present during any part of this test?    ☐ Yes  ☒ No

9. How long did the F.C.E. take? __4½__ Hours

10. How many of the Department of Labor's 20 physical demands of work are assessed in your particular physical abilities
    test? _____

11. Was the assessment protocol followed throughout the entire F.C.E.?    ☒ Yes    ☐ No
    If no, why not? _____

12. Have the identified capabilities/restrictions in this report been compared
    against normative data statistics?    ☐ Yes  ☒ No

13. Type of F.C.E.? Generic HealthSouth FCE

Managed by *Empire Medical Management, Ltd.*

Copyright ©    IAIABC
Certified Vendor    April 23, 1998

ROXBY 0086

EXHIBIT L

# *F.C.E. Summary (continued)*

Name  Bruce Roxby

Please check appropriate box and add weight amounts where appropriate

## ACTIVITY RECOMMENDATIONS*

| *As defined by the "Dictionary of Occupational Titles" | NEVER | OCCASIONAL 0 - 2.5 HOURS (1-33%) | FREQUENT 2.5 - 5.5 HOURS (34-66%) | CONSTANT OVER 5.5 HOURS (67-100%) | |
|---|---|---|---|---|---|
| SITTING | | | | ✓ with occas. position changes into standi. | |
| STANDING | | | ✓ | | |
| WALKING | | ✓ | | | |
| PUSHING | | 40 lbs force | 30 lbs force | | |
| PULLING | | 40 lbs force | 30 lbs force | | |
| CARRY (R) (B) | | 30 lbs - 100 ft | | | |
| CARRY (L) | | | | | |
| KNEELING | | | ✓ | | |
| CRAWLING | Not Tested | | | | |
| CROUCHING | | | ✓ | | |
| BENDING | | ✓ | | | |
| SQUATTING | | | ✓ | | |
| LIFT (overhead) | | 22 lbs. | | | |
| LIFT (waist lv) | | 35 lbs | | | |
| LIFT (floor) | | 45 lbs. | | | |
| STAIRS | | ✓ | | | |
| REPETITIVE FOOT | Not tested | | | | |
| FINE MANIP. | | | ✓ | | |
| FIRM GRASP | | ✓ | | | |
| SIMPLE GRASP | | | ✓ | | |
| CLIMBING | | ✓ | | | |
| BALANCING | | | ✓ | | |
| STOOPING | | | ✓ | | |
| REACHING | | | ✓ | | |

COMFORTABLE WORK LEVEL HEIGHT: __28__ INCHES(SITTING)  __40__ INCHES (STANDING)

_Yvonne Gass / C. Bedroom PT_ _____ __11 19 98__
Technician Signature _____ Date

April 23, 1998

Copyright ©



**HEALTHSOUTH**
Rehabilitation Center-Ft. Myers

CLIENT: Bruce Roxby
EMPLOYER: JM Pontiac-Hollywood FL
DATE OF INJURY: 5/25/98

DATE OF EVALUATION: 11/19/98

DATE OF REPORT: 11/19/98
HEALTHSOUTH I.D. NO. 235704533

REFERRED BY: Insurance Company
PHYSICIAN: Jeffrey Perkins, M.D.
INSURANCE CARRIER: Sunlife of
Canada/Empire Medical Management
INSURANCE REP: Bill Harney/Sandy
Mangano
INSURANCE I.D. NO.: 96878

## WORK CAPACITIES ASSESSMENT REPORT

### PURPOSE OF ASSESSMENT

Mr. Roxby was referred to HEALTHSOUTH Rehabilitation Center of Fort Myers for assessment of his current physical/functional capabilities and for determination of his potential to safely return to work.

### SUMMARY OF RESULTS

Mr. Roxby is a 51 year old male with the current diagnosis of status post cervical spinal cord injury and cervical/lumbar strain/sprain syndrome, onset 5/25/98. He reported that his injuries took place when he hit his head on a car tire while walking out from under a vehicle up on a hydraulic jack. Deficits found in the musculoskeletal evaluation included: postural and gait deviations; decreased spinal range of motion; decreased bilateral shoulder and abdominal strength; decrease lower extremity flexibility with limits greater on left; positive root tension tests on right; tenderness over C7 region; diminished lower extremity reflexes; unable to elicit C6-7 reflex. Other medical history positive for coronary artery disease diagnosed in May 1998 by Dr. Francis Schwerin (further medical evaluations and procedures pending).

Mr. Roxby had a Waddell's test score in the negative range (4 out of 16) for magnified illness behavior. Dynamometer testing revealed consistent effort on 6 out of 6 tests. Ransford Pain Diagram was negative for non-anatomical distributions of pain. Multidimensional Pain Inventory revealed dysfunctional coping skills regarding pain management. No inconsistencies in performance were observed during formal and informal evaluation.

Functional testing revealed that Mr. Roxby is presently lifting in the Medium category of work as demonstrated by his occasional floor to knuckle lift of 45 pounds, knuckle to shoulder lift of 35 pounds, shoulder to overhead lift of 22 pounds, and carry of 30 pounds 100 feet with pivoting. During positional tolerance testing, the client demonstrated tolerance of sitting on a constant basis; standing, repetitive bending, repetitive reaching, repetitive squatting, sustained squatting,

*1650 Medical Lane, Suite 1 • Ft. Myers, FL 33907 • 941 275-5444*

Work Capacities Assessment
RE: Roxby, Bruce

kneeling, pivot twisting, pushing/pulling, assemble, fine motor, and simple grasping
on a frequent basis; and walking, stair climbing, sustained bending, overhead
reaching, ladder climbing, writing, and firm grasping on an occasional basis.

## RECOMMENDATIONS

Mr. Roxby currently demonstrates the ability to perform work within the Medium
category or less, full-time, limiting walking, sustained bending, overhead reaching,
ladder climbing, writing, and firm grasping to an occasional basis. However, we
would recommend that medical clearance from his cardiologist be obtained before
his return to work.

## SUBJECTIVE HISTORY

Mr. Roxby is a 51-year-old male with the diagnosis of status post cervical spinal
cord injury and cervical/lumbar strain/sprain syndrome. He was injured on 5/25/93
when he hit his head on a car tire while walking out from under a vehicle up on a
hydraulic jack. At the time of injury, reports working for JM Pontiac as a line
technician (heavy mechanic). He reports that he had worked as a mechanic for 33
years. He also received training and experience in air traffic control while in the
service for 13 years. He reports that he has not worked since the time of his injury
in 1993.

Previous diagnostic tests for these injuries (as stated by the client) include x-rays,
nerve conduction test, EMG and a MRI. He reports that these tests have been
positive for cervical spinal cord injury with disc bulges at C3-4 and C5-7, decreased
ulnar nerve function on right, as well as cervical and lumbar sprain/strain syndrome.

Previous treatment for this injury (as stated by the client) included physical therapy
3 times per week for 4-5 months. He reports this treatment consisted of moist heat,
electrical stimulation, ultrasound, electrophoresis, and strengthening exercises. He
reports that physical therapy provided no improvement in his symptoms.

Mr. Roxby's pain complaints presently are a stabbing/burning pain surrounded C7;
numbness with pins & needles over right cervicoscapular region; burning centrally
over lumbosacral region; and an aching pain down posterior right leg from mid-thigh
to knee. He reported his pain is at an intensity of 5 (0 = no pain; 10 = severe pain).
He reported that recently his pain ranges from a 5 at best to 10 at its worst. He
stated that walking aggravates his symptoms the most, and that hot baths provide
the most relief. He currently takes aspirin three times per day to help manage his
pain symptoms. At the end of the evaluation, he said that his pain was at the same
intensity as it was prior to evaluation, but that he was now more uncomfortable. He
called the following day to update us on his condition as instructed. He reported his
pain at that time was now an 8 out of 10 with most of his pain in his neck and
shoulders.

ROXBY 0089

11/24/1999  09:37   19412755200        HEALTHSOUTH-FT  MYERS       PAGE  86

Work Capacities Assessment
RE: Roxby, Bruce

### JOB DESCRIPTION

A formal job analysis was not provided prior to the evaluation, therefore, a job description was obtained from the client and the Dictionary of Occupational Titles.

(By Client)
Mr. Roxby reported that, at the time of his injury, he was employed by JM Pontiac as a line technician (heavy mechanic). He described work in this job as requiring:

| | |
|---|---|
| Maximum weight lifted: | 150 lbs. (transmissions) within floor to knuckle level on an occasional basis. |
| Frequent weight lifted: | 70 lbs. (tires) within floor to shoulder range approximately 8 times per hour. |
| Maximum push/pull weight: | a vehicle with assistance of 2 to 3 people, a distance of 30 feet on an occasional basis. |
| Maximum carry: | 80 lbs. (torque converter / head) a distance of 150 feet on an occasional basis. |

Frequent standing walking, repetitive bending, sustained bending, overhead reaching, forward reaching, repetitive reaching, repetitive squatting, pivot twisting, pushing/pulling, repetitive wrist and forearm movements, fine motor, simple and firm grasping.

By Mr. Roxby's description, this work falls into the Very Heavy work classification category.

(By D.O.T.)
The Dictionary of Occupational Titles lists the work of a mechanic/repairer (heavy) (D.O.T # 620.381-022) in the Heavy work classification category.

### CARDIOVASCULAR ASSESSMENT

The American Heart Association "cardiovascular profile" ranked Mr. Roxby in the Medium risk category for the development of cardiovascular disease. His resting blood pressure was 122/90 mmHg, and his resting heart rate was 84 beats per minute.

The aerobic capacity assessment using a sub maximal 12-minute treadmill protocol was deferred due to current coronary artery disease. Dr Francis Schwerin, Mr Roxby's cardiologist, was contacted for medical clearance to perform FCE. Dr. Schwerin reported that Mr. Roxby could perform evaluation as tolerated.

ROXBY 0090

Work Capacities Assessment
RE: Roxby, Bruce

Blood pressures and heart rate responses throughout evaluation were within normal limits. Highest heart rate of 120 bpm was noted during positional tolerance testing. Highest blood pressure was noted at 132/80 mmHg during lifting evaluation.

## MUSCULOSKELETAL SCREEN

POSTURE:      Increased cervical lordosis and thoracic kyphosis.  No scoliosis noted. Bony landmarks of pelvic girdle are even

GAIT PATTERN: Patient ambulates independently without devices.  His gait is antalgic with limp on right.  Decreased arm swing on right noted.  Patient is able to heel and toe walk.

RANGE OF MOTION: Trunk range of motion is minimally to severely limited without complaints of increased pain with testing.  Measurements are as follows:

| Total Flexion | 31° | Lateral Flexion Right | 15° |
|---|---|---|---|
| Lumbar Flexion | 27° | Lateral Flexion Left | 20° |
| Total Extension | 15° | Rotation Right | 15° |
| Lumbar Extension | 8° | Rotation Left | 15° |

STRENGTH:  Bilateral lower extremity strength is 5/5 throughout.  Weaknesses noted in abdominal strength (3/5), shoulder flexion (4/5 on right and 4+ on left) and shoulder abduction (4/5 bilaterally).  No weakness noted in bilateral wrist and elbow flexion/extension (5/5).

NEUROLOGICAL:  Bilateral lower extremity DTRs are present but hyporeactive.  C5 reflex is intact bilateral.  Unable to elicit C6-7 reflex.  Sensation is intact with exception of patient reports of numbness along ulnar nerve path.  Root tension tests (SLR, Kernig, and Bilateral SLR) are positive on right.

FLEXIBILITY:  Bilateral lower extremity flexibility is within normal limits with exception of bilateral hip rotators (moderate restrictions) and left rectus femoris (minimum restrictions).

SOFT TISSUE ASSESSMENT: Tenderness noted over C7 paraspinal region.

WADDELL'S QUESTIONNAIRE: Mr. Roxby score was negative for magnified illness behavior. He scored 2 out of 7 for subjective symptoms, 2 out of two for past medical history, and 0 out of 7 for objective/physical signs for a total of 4 out of 16 (8 and > is positive).

ROXBY 0091

Work Capacities Assessment
RE: Roxby, Bruce

**BEHAVIORAL MEDICINE SCREEN:** Mr. Roxby completed the Multidimensional Pain Inventory (MPI) which revealed possible dysfunctional coping with regard to his current physical condition.

**RANSFORD PAIN DIAGRAM:** Mr. Roxby scored 0 out of 25 possible indicators of non-anatomical distributions of pain. Positive score of 3 or more reveals possible need for further psychological evaluation.

## FUNCTIONAL CAPACITIES ASSESSMENT/WORK TOLERANCE SCREEN

A thorough "functional" evaluation was completed. The safe maximum limits for material handling activities and the functional limits for non-material handling activities are summarized in the tables below.

Frequent material handling and non-material handling (positional) tolerances were assessed in a continuous activity circuit. The interval of activity lasted 70 minutes of a scheduled 90 minutes.

### Consistency of Effort Testing:

Mr. Roxby underwent a formal screening procedure of six different isometric strength tests designed to identify those individuals who put forth less than maximum effort on the evaluation tasks. Each task was repeated four times to test for consistency of response. A coefficient of variance statistic was calculated for each task. Mr. Roxby was consistent on 6 out of 6 tasks.

### FUNCTIONAL CAPACITIES EVALUATION
### WORK TOLERANCE SCREEN

**ISOMETRIC CONSISTENCY TESTS:**

| TEST | TRIALS (POUNDS OF FORCE) | AVERAGE | S.D./C.V. |
|------|--------------------------|---------|-----------|
| Isometric Push | 52,60,60,58 | 57.5 | 3.7/8.5% |
| Isometric Pull | 52,54,54,58 | 54.5 | 2.5/4.6% |
| Grip Strength, Left Hand | 76,85,85,85 | 82.7 | 4.4/5.4% |
| Grip Strength, Right Hand | 85,85,80,80 | 82.5 | 2.8/3.4% |
| 3-Jaw Pinch, Left Hand | 16,17,18,15 | 16.5 | 1.2/7.8% |
| 3-Jaw Pinch, Right Hand | 18.5,15,19,16 | 17.1 | 1.7/10.3% |

0%-15% considered consistent in effort
S.D. = Standard Deviation  C.V. = Coefficient of Variation

ROXBY 0092

Work Capacities Assessment
RE: Roxby, Bruce

MATERIAL HANDLING (LIFTING):

| LIFT | DEMONSTRATED | | JOB REQUIREMENT BY D.O.T. | | ADEQUATE FOR JOB |
|---|---|---|---|---|---|
| | Occasional | Frequent | Occasional | Frequent | YES/NO |
| Floor to Knuckle | 45 lbs. | Unable | 100 lbs. | 50 lbs. | NO |
| Knuckle to Shoulder | 35 lbs. | Unable | 100 lbs. | 50 lbs. | NO |
| Shoulder to Overhead | 22 lbs. | Unable | 100 lbs. | 50 lbs. | NO |
| 100 Ft. Carry | 30 lbs. | Unable | 100 lbs. | 50 lbs. | NO |
| Push/Pull | 40 lbs. Of force | 30 lbs. Of force | 100 lbs. Of force | 50 lbs. Of force | NO |

Comments: Mr. Roxby's lifting abilities were self-limited due to pain and fatigue.
Mr. Roxby requested to terminate frequent lifting evaluation due to fatigue. At this
time, his heart rate was 100 bpm and his blood pressure was 132/80. He was
noted to be moderately short of breath at this time.

ROXBY 0093

Work Capacities Assessment
RE: Roxby, Bruce

### NON-MATERIAL HANDLING:

| ACTIVITY | DEMONSTRATED | JOB REQUIREMENT By Client | ADEQUATE FOR JOB (YES/NO) |
|---|---|---|---|
| Sitting (60 Min/Episode) | Constant (17 min. continuous/56 min cumulative) | Occasional | YES |
| Standing (30 Min/Episode) | Frequent (continuous 30 min.) | Frequent | YES |
| Walking (30 Min/Episode) | Occasional (5 min. continuous/10 min. cumulative at moderate pace) | Frequent | NO |
| Climbing (stairs) (4 Flights/Episode) | Occasional | Not Required | YES |
| Sustained Bending (1 Min/Episode) | Occasional | Frequent | NO |
| Overhead Reach (1 Min/Episode) | Occasional | Frequent | NO |
| Squatting (repetitive) (5X/Episode) | Frequent | Frequent | YES |
| Kneeling (1 Min/Episode) | Frequent | Occasional | YES |
| Repetitive Bending (5X/Episode) | Frequent | Frequent | YES |
| Crouching (sustained squat) (1 Min/Episode) | Frequent | Occasional | YES |
| Ladder Climb (3 Rungs 3x/Episode) | Occasional | Occasional | YES |
| Trunk Twisting (5X/Episode) | Frequent | Frequent | YES |
| Forward Reaching (sustained) (1 Min/Episode) | Frequent | Frequent | YES |
| Forward Reaching (repetitive) (5X/Episode) | Frequent | Frequent | YES |
| Assembly | Frequent | Frequent | YES |
| Simple Grasp | Frequent | Frequent | YES |
| Firm Grasp | Occasional | Frequent | NO |
| Fine Motor | Frequent | Frequent | YES |
| Writing | Occasional (demonstrates compensatory writing behavior) | Occasional | YES |

Comments: Mr. Roxby is right-hand dominant. He assists his right hand during writing with the left as if to push right hand along. Intermittently, his right elbow is elevated significantly during writing. He reports that he pushes his hand along due to weakness and was unaware of his elbow movement. His writing is shaky but legible. Firm grasp is limited in right hand due to complaints of fatigue and decreased sensation. Sustained bending and overhead reaching were limited due to complaints of increased neck, shoulder, and low back pain.

ROXBY

11/24/1998  09:37   19412755⁻⁻⁹          HEALTHSOUTH-FT MY⁻ ⁵          PAGE  11

Work Capacities Assessment
RE: Roxby, Bruce

| PHYSICAL CHARACTERISTICS OF WORK | | | |
|---|---|---|---|
| PHYSICAL DEMAND | OCCASIONAL (0-33% OF WORKDAY) | FREQUENT (34-66% OF WORKDAY) | CONSTANT (67-100% OF WORKDAY) |
| SEDENTARY | 10 lbs. | NEGLIGIBLE | NEGLIGIBLE |
| LIGHT | 20 lbs. | 10 lbs. | NEGLIGIBLE |
| MEDIUM | 50 lbs. | 20 lbs. | 10 lbs. |
| HEAVY | 100 lbs. | 50 lbs. | 20 lbs. |
| VERY HEAVY | Over 100 lbs. | Over 50 lbs. | 50 lbs. |

U.S. DEPT. OF LABOR STRENGTH FACTOR: LIFTING/CARRYING/PUSHING PULLING OR OTHERWISE MOVING OBJECTS.

Thank you for referring to HEALTHSOUTH Rehabilitation Center of Fort Myers. If
you have any further question regarding this evaluation or the recommendations
made, please do not hesitate to contact us.

Constance Hohzorn, P.T.

Janeen Daniels, M.S.

ROXBY 0095



**Sun Life
of Canada**³
*Shining over America since 1895*

U.S. Headquarters Office

One Sun Life Executive Park
Wellesley Hills, MA 02181

Tel (781) 237-6030
Tel (800) 225-3950

## TRANSFERABLE SKILLS ANALYSIS

Claimant:    Bruce Roxby
Policy #:     96878
Policyholder:  J.M. Family Enterprises, Inc.

This claimant is a 51 yr. old man who was employed as a dealership Auto Mechanic when he injured his back in a fall at work in May of 1993. The initial diagnosis was noted to be Left Lumbar Facet Syndrome and Myofascial Pain Syndrome with a C6-7 Bulging Disc. The current diagnosis, based on Dr. Perkins' APS of 8/7/98, is noted to be C5-6 Disc Herniation with Lumbar Pain Syndrome.

### Education and Work History

The claimant is a High School graduate. He has also completed a number of auto service courses and is an ASE certified auto mechanic. He has many years of experience in this field and has worked at several auto dealerships. Mechanics who work at these locations tend to have a higher level of technical knowledge and skill than the average garage mechanic. Mr. Roxby was also employed as an Air Traffic Controller while in the Air Force.

### Functional Limitations and Restrictions

A Functional Capacity Evaluation was conducted at the HealthSouth Rehabilitation Center of Ft. Myers on 11/19/98 at Sun Life's request. Those test results indicated that he can perform work within the Medium category, full time, limited walking, sustained bending, overhead reaching, ladder climbing, writing, and firm grasping on an occasional basis. Because he has recently been diagnosed with CAD, the FCE facility recommended that medical clearance be obtained from his cardiologist prior to his RTW. His cardiologist did clear him for this evaluation.

### Skills Analysis

Although Mr. Roxby presents with some physical limitations he still possesses a number of excellent work skills and knowledge that would still be highly marketable. His higher level of technical knowledge in the automotive field would be an asset today even though he cannot do much of the very heavy physical labor required in his previous occupation. He retains much of the ability to work at exact tolerances and performance levels and complying with precise instruments and specifications and working to standards. He will suffer some loss of the ability

**ROXBY 008.**

**EXHIBIT M**



**Sun Life of Canada'**
*Shining over America since 1895*

U.S. Headquarters Office    One Sun Life Executive Park
Wellesley Hills, MA 02181

Tel (781) 237-6030
Tel (800) 225-3950

page 2

to use some of the tools utilized in heavy work. He also, apparently, has some limitations on fine manual tasks, at least with one of his hands, due to some loss of sensation and dexterity. The analysis shows a number of occupations he does qualify for based on his residual skills. In the auto industry he could easily transition to Service-Repair Estimator, Service Manager, Dispatcher or Auto Tester. Auto Damage Appraiser may be another option for Mr. Roxby.

The required ability to deal with people as a mechanic would not be affected by his limitations an would be an asset in customer service roles as mentioned above. His past military experience in the Air Traffic Control position is also useful. His familiarity with the air transportation industry, albeit at the military level, would still be of some value for the less physical occupations within that field.

Overall, this individual does have residual skills that are transferable to a number of occupations and, therefore, does not appear to be disabled from all occupations.

William J. Harney CRC LRC

ROXBY 0083

**LifeStep**

Licensed to Sun Life of Canada

ge 1

## TSA With Wage Data Report For Bruce Roxby

11/25/98

ased on search results, this report divides job titles into levels arranged in order of decreasing transferability. Each level compares a person's skills, as monstrated in work experience, with selected jobs from the Dictionary of Occupational Titles(DOT). These comparisons describe levels of transferability from 9. Highlighted entries represent jobs currently selected as vocational goals. The MPSMS and/or Work Fields have been modified for at least one of the jobs tained in the client's work history, in order to accurately reflect the unique skills acquired in a work environment.

### Job Search Parameters - Search Conducted On Work History & Functional Capacity

| SVP | GED | Aptitudes | Strength & Physical Demands | Environmental | Temperaments |
|---|---|---|---|---|---|
| | | R M L G V N S P Q K F M E C S | 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 | 1 2 3 4 5 6 7 8 9 10 11 12 13 14 | D R I V E A S T U P I |
| | | 4 3 4 | M O F F F F F F O | | |
| 8 | 193 162-018 - AIR TRAFFIC CONTROL CRAFTSMAN | | | | |
| ~ | 620.261-010 - AUTOMOBILE MECHANIC | | | | |

### Level 1 Transferability: Same Work Fields and MPSMS as demonstrated in work history

4 Occupations

| DOT Code | Job Title | GED | SVP | S | GOE | Aptitudes G V N S P Q K F M E C CEN Code | Average Weekly Earnings Amount |
|---|---|---|---|---|---|---|---|
| 20.261-014 | AUTOMOBILE TESTER | 433 | 7 | L | 05 07.02 | 3 3 4 3 3 4 4 3 3 3 4 | 689 | $593 00 |
| 23 367-010 | GATE AGENT | 323 | 4 | L | 09 05 04 | 3 3 4 4 4 3 4 4 4 5 5 | 318 | $498 00 |
| 20.364-010 | SQUEAK, RATTLE, AND LEAK REPAIRER | 222 | 4 | M | 05 12.15 | 3 4 4 3 3 4 4 4 3 5 5 | 514 | $396 00 |
| 20 261-018 | AUTOMOBILE-REPAIR-SERVICE ESTIMATOR | 433 | 7 | L | 05 07.02 | 3 3 3 3 4 3 4 4 3 4 5 | 689 | $593 00 |

### Level 3 Transferability: Same Work Fields and similar MPSMS as demonstrated in work history

26 Occupations

| DOT Code | Job Title | GED | SVP | S | GOE | Aptitudes G V N S P Q K F M E C CEN Code | Average Weekly Earnings Amount |
|---|---|---|---|---|---|---|---|
| 248 367-030 | WATERWAY TRAFFIC CHECKER | 333 | 3 | S | 07 04 05 | 3 3 4 3 3 3 4 4 5 5 4 | 357 | $581 00 |
| 152 577-010 | BUS ATTENDANT | 323 | 2 | L | 09 01 04 | 3 3 4 4 4 3 4 4 3 3 5 | 463 | N/A |
| 29 687-014 | HELPER, MANUFACTURING | 211 | 2 | M | 06 04 34 | 4 4 4 4 4 4 4 4 3 5 5 | 874 | N/A |
| 249 167-014 | DISPATCHER, MOTOR VEHICLE | 323 | 5 | S | 07 05 01 | 3 3 4 4 4 3 4 4 4 5 5 | 359 | $478 00 |
| 239 167-018 | LABOR EXPEDITER | 434 | 5 | L | 07 01 02 | 3 3 3 5 4 3 4 4 4 5 5 | 373 | $416 00 |
| 237 137-010 | SUPERVISOR, TELEPHONE INFORMATION | 434 | 7 | S | 07 04 04 | 2 2 2 4 4 2 4 4 4 5 5 | 303 | $677 00 |
| 248 367-026 | DISPATCHER, SHIP PILOT | 333 | 4 | S | 07 04 05 | 3 3 3 4 4 2 3 4 4 5 5 | 359 | $478 00 |
| 352 677-010 | PASSENGER SERVICE REPRESENTATIVE I | 323 | 3 | L | 09 01 04 | 3 3 4 4 4 4 4 3 4 5 | 463 | N/A |
| 825 684-018 | BATTERY CHARGER | 221 | 3 | M | 05 12.16 | 4 4 4 4 3 5 4 4 3 5 5 | 889 | $547 00 |
| 278 131-026 | MECHANICAL-MAINTENANCE SUPERVISOR | 433 | 7 | M | 05 05 09 | 3 3 3 2 3 3 3 3 2 5 5 | 503 | N/A |
| 521 137-010 | SUPERVISOR, RECLAMATION | 433 | 6 | L | 05 05 09 | 3 3 3 3 4 4 4 4 5 5 | 628 | N/A |
| 219 367-050 | SHIPPING-ORDER CLERK | 323 | 4 | L | 07 05 04 | 3 3 3 4 4 3 4 4 5 5 | 364 | $590 00 |
| 237 367-018 | INFORMATION CLERK | 423 | 2 | L | 07 04 04 | 3 2 3 4 4 3 4 3 4 5 5 | 323 | N/A |
| 910 367-026 | PASSENGER REPRESENTATIVE | 323 | 4 | L | 09 01 04 | 3 3 3 4 3 3 4 4 4 4 5 | 463 | N/A |
| 910 384-010 | TANK-CAR INSPECTOR | 323 | 4 | M | 05 10 02 | 3 4 4 3 3 4 4 4 3 5 5 | 689 | $593 00 |
| 910 167-014 | TRAIN DISPATCHER, ASSISTANT CHIEF | 423 | 7 | S | 05 09 02 | 2 3 4 4 4 3 4 4 3 5 5 | 359 | $478 00 |
| 237 367-010 | INFORMATION CLERK, AUTOMOBILE CLUB | 434 | 5 | S | 07 04 04 | 3 2 3 4 4 2 4 4 4 5 5 | 323 | N/A |
| 219 462-014 | TRAIN CLERK | 322 | 3 | S | 07 05 03 | 3 3 3 5 4 3 3 3 4 5 5 | 336 | N/A |
| 237 137-014 | SUPERVISOR, TRAVEL-INFORMATION CENTER | 434 | 6 | L | 07 04 04 | 2 2 3 4 4 2 4 4 4 5 5 | 303 | $677 00 |
| 353 167-010 | GUIDE, TRAVEL | 434 | 6 | L | 07 05 01 | 2 2 3 4 4 3 4 4 4 5 4 | 461 | N/A |
| 229 684-010 | BATTERY INSPECTOR | 333 | 4 | L | 05 10 03 | 3 4 3 3 4 4 3 4 3 5 4 | 533 | $604 00 |
| 239 367-022 | RECEIVER-DISPATCHER | 323 | 4 | L | 07 04 05 | 3 3 3 5 5 3 4 4 4 5 5 | 359 | $478 00 |
| 706 684-046 | BENCH HAND | 222 | 3 | M | 06 04 22 | 4 4 4 4 4 5 4 4 3 4 5 | 785 | $506 00 |
| 21 684-014 | RECLAMATION WORKER | 322 | 4 | M | 05 12.12 | 3 4 4 3 4 4 3 4 3 5 5 | 547 | $521 00 |
| 237 367-050 | MANAGER, TRAFFIC II | 322 | 6 | S | 07 04 04 | 3 3 3 5 5 3 4 4 4 5 5 | 389 | N/A |
| 253 367-050 | TRAVEL CLERK | 333 | 4 | S | 07 04 04 | 3 3 3 4 3 2 4 4 4 5 5 | 318 | $494 00 |

### Level 4 Transferability: Similar Work Fields and similar MPSMS as demonstrated in work history

4 Occupations

| DOT Code | Job Title | GED | SVP | S | GOE | Aptitudes G V N S P Q K F M E C CEN Code | Average Weekly Earnings Amount |
|---|---|---|---|---|---|---|---|
| 22 137-014 | SUPERVISOR CAR AND YARD | 322 | 7 | S | 05 05 06 | 3 3 4 3 3 4 4 4 4 5 5 | 503 | |

# LifeStep

ased on search results, this report divides job titles into levels arranged in order of decreasing transferability. Each level compares a person's skills, as monstrated in work experience, with selected jobs from the Dictionary of Occupational Titles(DOT). These comparisons describe levels of transferability from ₃ 9. Highlighted entries represent jobs currently selected as vocational goals. The MPSMS and/or Work Fields have been modified for at least one of the jobs .tained in the client's work history, in order to accurately reflect the unique skills acquired in a work environment.

| Job Search Parameters - Search Conducted On Work History & Functional Capacity | | | | |
|---|---|---|---|---|
| SVP : GED : | Aptitudes | Strength & Physical Demands | Environmental | Temperaments |
| | R M:L .G:V:N:S:P:Q:K: F,M:E:C:S; 1:2:3;4:5:6;7:8;9 10:11:12:13:14:15:16:17:18:19 1..2:3,4:5:6;7:8 9 10:11:12:13:14:D R 1,V:E:A S:T:U:P:J. | | | |
| | 4:3 4: : : : : : : : : : M:O:F:F:F:F: :F:F:O: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : |
| 8 | ;193.162-018 - AIR TRAFFIC CONTROL CRAFTSMAN | | | |
| 7 | 620.361-010 - AUTOMOBILE MECHANIC | | | |

| Level 4 Transferability: Similar Work Fields and similar MPSMS as demonstrated in work history | | | | | |
|---|---|---|---|---|---|
| | 4 Occupations | | | Aptitudes | Average Earnings |
| DOT Code | Job Title | GED:SVP:S: GOE 'G.V:N:S:P:Q:K:F M:E:C CEN Code | | | Amount |
| 34.167-286 | GENERAL CAR SUPERVISOR. YARD | 433 : 7   L: 05 02.02 ,3:3'4:4:3 3;5:4:5:5:5:   022 | | | N/A |
| 22.684-022 | TANK-CAR INSPECTOR | ;212   4   M: 05 12.12 ,3'4:4.4 4 4 3:4:3:4:5:   796 | | | $508.00 |
| 39 687-018 | CANOE INSPECTOR. FINAL | .211   4   L: 06 03.02 :4 4,4:4.3 4 4 4.3:5 5:   796 | | | $508.00 |

ROXBY 0085



**Sun Life
of Canada®**

One Sun Life Executive Park
Wellesley Hills. MA 02481

Tel: (781) 237-6030
(800) 225-3950

July 1, 1999



Spencer A. Emison
Law Offices
1999 SW 27ᵗʰ Ave.
1ˣ floor
Miami. FL 33145

Re:    Policy No: 96878-GD-Long Term Disability
       Claimant: Bruce Roxby

Dear Mr. Emison:

We are writing to you at this time concerning the above-captioned Long Term Disability claim.

As you are aware. in order to be eligible for benefits. an insured must be considered totally
disabled as defined by the Policy. During the first 60 months of disability. the Policy defines
total disability as the inability of the insured to perform all of the material duties of his regular
occupation.

Once 60 months of benefits have been paid. the definition of disability changes. At that time,
the insured must be totally disabled from performing the material duties of any gainful
occupation for which he may be reasonably fitted by his training, education or experience. In
Mr. Roxby's case. that change of definition occurred on November 22, 1998.

The medical information provided to date, does not establish eligibility for benefits beyond
November 21, 1998. Mr. Roxby was treated by Dr. Jeffrey Perkins, for Status post cervical
spinal cord injury and Status post cervical and lumbar strain and sprain syndrome where
maximum medical improvement was reached in 1993. He was also treated by Dr. Francis T.
Schwerin for symptoms suggestive of angina and several risk factors for coronary disease. A
Functional Capacity Evaluation (FCE). was performed on November 19, 1998 and a
Transferable Skills Analysis (TSA) was done which shows that Mr. Roxby can work
specifically at jobs which include, but are not limited to Service-Repair Estimator, Service
Manager, Dispatcher or Auto Tester. Auto Damage Appraiser maybe another option for Mr.
Roxby. Since Mr. Roxby is not totally disabled from performing any gainful occupation, we
will be unable to provide any benefits beyond November 21, 1998.

Our records reveal that we sent Mr. Roxby a letter, dated July 24, 1998, advising him of the
change in definition language which would become effective November 22, 1998. We asked
that he have his physician complete an Attending Physician's Statement which we enclosed.

On September 30, 1998 we wrote to Mr. Roxby noting the Attending Physician's Statement we
received, completed by Dr. Perkins, states he was last seen November 9, 1997. We asked for
confirmation that he did have current treatment and, in addition requested he have his doctor
submit copies of all office notes, physical therapy notes and diagnostic testing for January,
1996 through the current time.

RO⁚ .

EXHIBIT N

Page 2

On October 14, 1998 we received Dr. Perkins' notes for a visit on October 30, 1996 which stated "Physical examination reveals a pleasant make in no acute distress. Chest was clear. Heart had a regular rate and rhythm. Abdomen and bowel sounds positive. The patient has restricted passive ROM of the cervical spine with flexion extension. The patient has limitation of back ROM in all planes. Both hands have decreased coordination and dexterity. Muscle strength appears functional throughout all the extremities. Patient does ambulate without an assistive device with an antalgic-type gait." IMPRESSION: "1. Status post Cervical lumbar strain, sprain. 2. Probable central cervical spinal cord injury.." PLAN: "1. The patient should continue with his exercise program. 2. The disability form was filled out. 3. I will see the patient for further evaluation."

The next note, dated October 9, 1997, states "Examination reveals a pleasant male in no acute distress. There is essentially no change. Bowel sounds positive. The patient has some restriction of the cervical spine on extension. Both hands have decreased fine motor skills. The favoring the right lower extremity. Per the patient, his wife gve him a wooden cane but he is not using is presently." IMPRESSION: "1. Status post central cervical spinal cord injury. 2. Status post cervical lumbar strain and sprain syndrome, MMI reached in 1993. PLAN: 1. The patient will continue his home exercise program. 2. A disability form was filled out. 3. The patient will benefit from ambulating with a straight cane or a quad cane. 4. I will see the patient back in follow-up appointment."

The last office note received, dated August 7, 1998, states "Physical examination is essentially unchanged. Chest is clear. Heart had regular rate and rhythm. The patient still has bilateral hand movement with decreased coordination. The patient was able to ambulate with a functional but slow gait pattern. There is decreased range of motion of the right lower extremity hip extensors and the extensors in ankle dorsi flexion." IMPRESSION: "1. Status post cervical spinal cord injury. 2. Status post cervical and lumbar strain and sprain syndrome. Maximum medical improvement was reached in 1993. PLAN: 1. The patient will benefit from continuation of his home exercise program. 2. A disability form was filled out. 3. The patient will benefit from continuing with his cholesterol sparing diet and continue with his vitamins including B complex and folic acid. 4. I would like to see the patient back in the office for follow-up in approximately one year. The patient does have a hip hiking gate pattern with a Trendelburg type weakness of the left gluteus medius and decreased swing through on the right lower extremity."

At this point Mr. Roxby's file was reviewed by our Medical Consultant and it was recommended that we have the Functional Evaluation Examination and Transferable Skills Analyst, which we mentioned above. The results of this examination were forwarded to Attorney Mark Hicks, however, another copy is enclosed with this letter for your perusal along with a copy of the Transferable Skills Analyst. We also wrote to Mr. Roxby's cardiologist, Dr. Schwerin, as it was suggested we receive medical clearance from his cardiologist before his return to work. Dr. Schwerin's response was received on April 19, 1999 and he stated "I am able to agree with the "cardiovascular assessment" contained within the Functional Capacity Evaluation. A stress test was performed 5/11/98 for 5 minutes of the Bruce Protocol witthout chest pain or ST shift. (MAX HR 144 BPM and max BP 170/80.) Nuclear images

Page 3

suggested a small area of inferior ischemia at this level of exercise. Mr. Roxby has remained asymptomatic and wishes to continue his strict dietary and nutritional therapy before considering an invasive procedure. In summary, while there was evidence of a mild degree of exercise-induced ischemia at last year's evaluation, CAD probably contributed minimally to his disability."

We had Mr. Roxby's file reviewed by our in-house consultant, Dr. Valerie Kaufman. Dr. Kaufman's review acknowledged some restrictions and limitations, but noted the the FCE verified considerable residual functionality. Dr. Kaufman also notes that Mr. Roxby appears to have some CAD although not very limiting. Mr. Roxby should not perform heavy physical or sustained physical exertion, but appears capable of sedentary or light duty work per Dr. Schwerin's letter.

The FCE suggests Mr. Roxby is capable of performing medium duty work. Our Rehabilitation Consultant noted on June 16, 1999 that "If we step down his restrictions to light vs. Medium the TSA still shows a number of occupations that he is able & qualified to perform."

In conclusion, based on the information stated above, we must deny further benefits as Mr. Roxby no longer is eligible to receive them. In making this denial we fully reserve and do not waive any of our rights, whether arising under the policy or otherwise.

The decision which has been reached regarding this claim may be appealed by filing a written request for review with Sun Life of Canada or the plan administrator for submission to Sun Life. The request should be made in writing within 60 days from receipt of this letter and should include any medical information which you and Mr. Roxby may feel has a bearing on this decision. If you desire to pursue an appeal, please be advised that under ERISA you are entitled to review the pertinent documents upon which this initial denial decision was based. The claim will be given prompt and full review after which you will be advised of our decision in writing.

Should you have any questions, please do not hesitate to contact this office at 1-800-432-1102 x3399.

Sincerely,

*Laurel E. Morris*

Laurel E. Morris
Sr. Claims Administrator
SC 3208

Enc.

ROXBY 0065




**LAW OFFICES OF SPENCER A. EMISON, P.A.**

August 27, 1999

## VIA FAX & CERTIFIED MAIL

Ms. Laurel E. Morris
Sr. Claims Administrator
Sun Life of Canada
One Sun Life Executive Park
Wellesley Hills, MA 02481

**RE: Claimant Bruce Roxby,**
    **Policy No. 96878-GD-Long Term Disability**

Dear Ms. Morris:

### APPEAL FROM CLAIM DENIAL

Mr. Roxby appeals your July 1, 1999 denial of his claim for benefits under the above referenced policy on the following grounds:

1. Roxby references and incorporates herein the attached January 26,1999 letter by attorney Mark Hicks which details defects in Sun Life's analysis and denial of this claim.

2. **Sun Life has failed to give proper consideration to Roxby's treating physician's findings:**

    In your possession (another copy attached) is a 1/7/99 office note from Roxby's long term treating physician, Dr. Jeffrey Perkins, which sets forth Dr. Perkins finding that Roxby has a very limited capacity and endurance to work due to his central spinal cord injury and significant blockage of an artery. Dr. Perkins specifically disagrees with the functional capacity assessment because of Roxby's history and condition, including weakness, coordination problems, and heart condition. Dr. Perkins also points out the danger of Roxby aggravating his spinal cord injury and heart condition if he overexerts himself or moves his hands in common actions. Yet your denial of benefits entirely fails to consider these findings and opinions.

    Dr. Perkin's 6/3/99 office note (attached) also references Roxby's difficulty walking, because of a significant limp and decreased range of motion, which further limits his activities.

RECEIVED

SEP 0 1 1999

LONG TERM DISABILITY

1999 S W 2TH AVENUE

FIRST FLOOR

MIAMI FLORDA

33145

TEL

FAX

ROXBY 0003

EXHIBIT O

3. **Sun Life's evaluation of Roxby is inadequate and unsupported:**

To date, no doctor who has actually treated or examined Roxby has come to the conclusions Sun Life has regarding Roxby's physical abilities or capacity to work. You reference the opinion of Roxby's cardiologist, Dr. Schwerin, that Roxby is capable of sedentary or light duty work, but you fail to appreciate that this takes into consideration only Roxby's heart condition. Your "in-house consultant," whose records and reports are hereby requested, cannot make an adequate determination of Roxby's abilities without examining him herself. Nor have you stated her qualifications to render an opinion which takes into consideration Roxby's orthopedic, neurological, and cardiac condition.

The Work Capacities Assessment acknowledges the severe limitations and difficulties Roxby suffers from, even commenting on his need to assist his dominant right hand with his left when writing, and the pain he experienced while performing simple tasks. It also records his report, the day after the assessment, of severe pain which resulted from the 4 hours of testing.

Despite this assessment, the "Transferable Skills Analysis" found Roxby capable of full time, Medium category work. The analysis references the physicians' diagnoses regarding Roxby's disc injuries and back pain, but makes no mention of the much more serious spinal cord injury. Nor does it factor in his heart condition. The analyst completely misses the simple truth that Roxby cannot even write without difficulty, and that the most sedentary of tasks, done repetitively, cause him great pain. Nor does the report consider the potential for aggravating Roxby's spinal cord injury, the result of which could be paralysis.

What company will hire, train, and retain for the position of Service-Repair Estimator, Service Manager, Dispatcher, Auto Tester, or any position, a 52 year old man who has difficulty simply writing, and who exposes such company to significant risk of liability for an on the job injury ?

4. **Sun Life has failed to give any consideration to the chronic and cumulative nature and impact of Roxby's injuries and heart condition:**

Mr. Roxby was first injured 10 years ago in an automobile accident at which time he was diagnosed with the disc injuries and related ulnar neuropathy. He continued to work until he was once again injured on the job when his head struck a tire while he was walking out from underneath a car. Added to his physical problems was the diagnosis of central spinal cord ischemia and increasingly exacerbated symptomology. He was left with a severe limp, decreased fine motor skills, weakness and numbness in both hands, herniated and bulging discs, restricted range of motion and weakness in his extremeties, and severe, constant pain in his neck, back, and shoulder. On top of all of this he is

2

suffering from exercise induced myocardial ischemia  which further limits his ability to carry on normal activities, including work, which he simply cannot do in any capacity.

Your Work Capacities Assessment Report confirms that Mr. Roxby is no malingerer. He showed consistent effort on all tests. He did not exaggerate his symptoms. He had no non-anatomical distribution of pain.

Mr. Roxby is suffering from a completely disabling, and debilitating, combination of physical ailments which prevent him from working in any capacity. He is totally disabled as that term is defined in the policy, and in the case law on this issue. He is entitled to his benefits under the policy.

It is further our position that Sun Life has waived preemption under ERISA by the policy language which states the policy is governed by the laws of the jurisdiction where the application was signed, which is Florida. Therefore, contemporaneously with this appeal, I am filing suit in state court to recover benefits past due, and to obtain a declaration from the court that Sun Life is obligated to pay future disability benefits. Mr. Roxby will also be pursuing a claim for Social Security disability benefits.

I await your response.

Very truly yours,

Spencer A. Emison

3

ROXBY 0055

**ROXBY, BRUCE**                                      CLINIC NOTE
**JANUARY 7, 1999**

Mr. Roxby returns today for a follow-up appointment. He was last
seen on August 7, 1998. At that time, I recommended continuation
of a home exercise program and a disability form was filled out.
He continues to be diligent with his cholesterol sparing diet and
is taking multiple vitamins, including Folic acid. He is also
contemplating beginning cessation of cigarette smoking. Of note,
he was found to have 80% blockage of the posterior descending
artery and is on aspirin 325 mg three times a day. According to
his cardiologist, Dr. Schwann, he feels he should have a bypass
graft. He had a functional capacity workup assessment done on
11/19/98. The recommendations from that demonstrated that he had
the ability to return to work full time with medium category or
less with limited walking, sustained bending, overhead reaching,
ladder climbing, writing and grasping on an occasional basis. Per
review of the records and review of the history, I disagree with
that.

I feel that the patient has a very limited capacity with very
limited endurance to enable him to carry out a full job of 8 hours
a day. When he is doing gardening, he has to come in after a short
while and rest for a longer while. He does have decreased arm
swing on the right and decreased ankle dorsiflexion on the right.
He also has noted disk bulge at C3, C4, C5, C7 and central cord
syndrome and central cord ischemia. He does have weakness of his
right hand compared to the left hand. He does compensate by
handing items from his left to his right. He had a test which
involved pegs and he was compensating by being helped with the left
hand in sliding the items. He definitely has coordination problems
of the right hand and some on the left.

Physical examination reveals a pleasant male in no acute distress.
The patient was able to transfer with standby assist and ambulate
for moderate distances with a decreased arm swing on the right and
a Trendelenburg type gait pattern with hip hiking on the right.
There continues to be decreased range of motion of the right lower
extremity, the ankle extensors and ankle dorsiflexors.

**IMPRESSION:**

1.   Status post cervical spinal cord injury.    *central cord ischemia*
2.   Status post cervical and lumbar strain and sprain syndrome.

**PLAN:**

1.   The patient will benefit from continuation of his home
     exercise program.
2.   He will also benefit from continuation of his vitamin regimen
     which includes B complex and Folic acid.

ROXBY, BRUCE                                        CLINIC NOTE
JUNE 3, 1999

The patient returns today for a follow-up appointment. He was last
seen on 1/7/99. At that time, I recommended continuation of his
home exercise program and also continuation of his vitamin regimen
including B complex and folic acid. I also recommended that the
patient not return to work at full capacity, however, for four
hours at minimum category. The patient did have a nuclear
cardiology scintigraphy test done on 5/11/99 which demonstrated
that he was exercise induced myocardial ischemia in the territory
of the posterior descending artery. This would prohibit him from
doing any strenuous activities continuously. The patient would
like to go back to work, however he is not able to in his present
condition. His cardiologist also agrees with me. If he does go
back to work, it is with limited walking, decreased overhead
reaching, no ladder climbing and no excessive grasping or writing.

I feel that he has a very limited capacity, very limited endurance
and not able to carry on his full job. He is only able to work
approximately four hours a day at minimum capacity. He does have
disc bulge at C3, C4, C5, C7 and central core syndrome and central
cord ischemia. There is weakness of the right hand compared to the
left. He does have coordination problems in the right upper
extremity and some on the left.

Physical examination is essentially unchanged. The patient could
transfer with standby assist and ambulate with a functional gait
pattern though he does have decreased arm swing on the right side
and a Trendelenburg type gait pattern with hip hiking on the right
side. There continues to be decreased range of motion at all gait
cycles of the right lower extremity.

IMPRESSION:

1.    Status post cervical cord ischemia with cervical spinal cord
      injury.
2.    Status post cervical and lumbar strain and sprain syndrome.

PLAN:

1.    The patient will continue with his home exercise program.
2.    He will also benefit from his Vitamin B complex and also
      continue with his not working at this point. I recommend
      strongly that if he were to go back to work, it would only be
      for four hours or less at minimal capacity.
3.    I would like to see the patient back in the office in
      approximately six months.

_____
Jeffrey C. Perkins, M.D.

JCP/act

RECEIVED

SEP 0 1 1999

LONG TERM DISABILITY

ROXBY 0078

TO:      FILE

FROM:    Laura L. Ketchum

DATE:    10/10/99

RE:      ERISA review for Bruce Roxby
         Group No.: 96878
         Control No.: 090998-20000

The clmt is a 52 y.o. auto technician/mechanic claiming disability due to a neck and back injury resulting from a fall at work. DOH 7/14/82; EDOC 7/14/83; LDW 5/25/93. 60 month own occ def of dis. Claim denied not TD any occ based on FCE, cardio opinion (sed-light wc) and TSA which identified occs w/in light capacity.

AP Lang 5/26/93: low grade cervical radiculopathy C6-7 w/ numbness and tingling in C7 distribution; Rx PT and anti-inflammatories 4-6 weeks.

12/8/93: Dx myofascial pain syndrome. left lumbar facet syndrome; clmt found to be at MMI by Dr. Novick. Walk 15 min; sit 20 min; stand 20 min; lift 25 lbs; push 10 lbs.

3/24/94 SSDI denied.

10/3/94 Dr. Mendelsohn agrees w/ Dr. Novick that clmt is at MMI.

3/28/95 Dr. Bonis Dx cervical lumbar sprain and strain.

Med consult review 10/98 found functional capacity: rec FCE and TSA, but said to get okay from cardiologist (Dr. Schwerin) (recent Dx CAD).

FCE: medium capacity, FT; limited walking, sustained bending, overhead reaching, ladder climbing, writing, and firm grasping on an occasional basis.

Med consult 6/10/99: clmt has sed or light duty capacity based on cardio and back info. (Cardiologist agrees w/ FCE but won't comment on neurological aspects 4/13/99).

TSA in file based analysis on AP Perkins info from APS dated 8/7/98 and FCE results of 11/98. TSA identified occs w/in sed or light duty capacity: service repair estimator, service manager, dispatcher, auto tester, auto damage appraiser.

Clmt appeals through atty and submits OTN dated 1/7/99 from Dr. Perkins (last saw clmt 8/7/98) who asserts that clmt only has PT minimal capacity work capacity. Also asserts that there was an underpayment of clmt's benefits (60% v. 70% benefit minus offsets, whichever is lesser amt; atty wants 70% minus worker's comp offset).

Pre-dis earnings: $59,527.83/yr; 4,960.65/month; 1,144.77/week.
Gainful (w/out 5 yrs indexation): $35,716.70/yr; 2,976.39/month; 686.86/week

REC: gainful is an issue. Voc identified occs that are not gainful (60% of pre-dis indexed earnings) but are w/in clmt's skills. Claim is payable unless med supports functional capacity for own occ or voc can identify gainful any occs. Consider further investigation of functional capacity and/or settlement.

Additional note: file needs page 8 of the policy.

ROXBY 0049

EXHIBIT Q

## MED-SET
### Independent Medical Examinations

October 28, 1999

2

Ms. Jacqueline Heintz
Sun Life of Canada Ins. Co.
One Sun Life Executive Park
Wellesley Hills MA 02481

RE: Bruce Roxby c/o
Spencer A. Emison
1999 S.W. 27th Ave
Miami FL 33145
Tele: 305-860-1901
Claim No. not listed
Policy No. 96878

Dear Ms. Heintz:

As requested, we have arranged to have the above-named Claimant seen for a **Functional Capacity Examination** on 11-18-99 @ 9:00 a.m. to 1:00 p.m.

The Claimant will be examined by a : Pamela Freehan, Physical therapist

@ Suncoast Rehabilitation
90 Cypress Way Ease Suite 65
Naples, FL 34110
Tele: 941-591-2620

Please forward all relevant medical information and questionnaires you desire, if any, to the physical therapy center at your earliest convenience.

Thank you for your confidence in Med-Set. We greatly appreciate your business; we will follow up with a telephone call on the day after the examination.

Sincerely yours,

Cristina Herrera

P.O. Box 161994, Altamonte Springs, FL 32716-1994 • Tel. (407) 862-4660 • Fax (407) 862-7 .

ROXBY 0030
EXHIBIT R

To: Attila Lore - Bassett Agency

Fm: Jacqueline Heintz, Sun Life

Re: *Surveillance Request*

**BRUCE ROXBY**
Policy # 96878
Control # 271293-20003-00

Address: 2636 SW Terrace, Naples, FL 34116
Telephone: (941)370-9289
SSN: 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

Diagnosis: Cervical Radiculopathy C6-7, Cervical Strain/Sprain
Symptoms: Pain in neck, lower Back with limited range of motion, decreased hand motion

> Could walk with a limp, and/or with use of a cane. Limited
> in ability to stand, walk, sit, carry, crouch or climb stairs.

Advised to have surgery...to date, has not chosen to do so. Never really participated in a
physical therapy program to recondition himself to be able to return to work.

Still a question as to the severity of his condition.

Physical description of the claimant:
5'10"
weight: 160-170 lbs.
Grayish hair
glasses

**Attila, please set up surveillance for 3 days in order to video his activity level.**

**Call me with any questions. Thanks.**



**Sun Life
of Canada°**

One Sun Life Executive Park
Wellesley Hills, MA 02481

Tel: (781) 237-6030
(800) 225-3950

November 19, 1999

Mr. Spencer A. Emison
Law Offices
1999 SW 27ᵗʰ Avenue
1ˢᵗ Floor
Miami, FL  33145

RE:  Policy Number: 96878-GD-Long Term Disability
      Claimant: Bruce Roxby

Dear Mr. Emison:

This letter is in regard to Mr. Roxby's appeal of the denial of Long Term Disability benefits.
Based on the review of Mr. Roxby's claim, our decision to deny Mr. Roxby's claim for Long
Term Disability benefits has not changed.  This is our final determination and his file will remain
closed.

In order to be eligible for benefits, an insured must be considered Totally Disabled as defined by
the Policy.  During the first 60 months of disability, the Policy defines Total Disability as "the
inability of the Insured to perform all of the material duties of his regular occupation." Once 60
months of benefits have been paid, the definition of disability changes.  At that time, "the Insured
must be Totally Disabled from performing the material duties of any gainful occupation for
which he may reasonably be fitted by his training, education, or experience." In this case, the
change of definition occurred on November 28, 1998.

Under the Policy, Sun Life of Canada also has the right to examine the Insured.  "We have the
right to examine any person for whom a claim for benefits has been made and to do so as often as
we may reasonably require." (page 20 of the policy).

On October 21, 1999, a letter was sent to you indicating that we were reviewing Mr. Roxby's
claim due to the appeal.  We also informed you that we were exceptionally extending the
timeframe and adding an additional 60 days as we planned to conduct a very detailed Functional
Capacities Evaluation.

On October 28, 1999, a letter was sent to your office, from Med-Set, an Independent Medical
Examination scheduling company, indicating that an appointment had been set up for Mr. Roxby
to attend a Functional Capacities Evaluation on November 18, 1999, from 9:00 a.m. to 1:00 p.m.
This examination was to take place at Suncoast Rehabilitation, 90 Cypress Way Ease, Suite 65,
Naples, Florida.

**ROXBY 0029**

**EXHIBIT S**

Page 2
November 19, 1999

The letter also stated that if Mr. Roxby could not make this appointment, you must contact Med-Set immediately. If Mr. Roxby failed to keep this appointment and if he did not cancel within the physical therapy center's time limits, which was 48 hours prior to the examination, he could be liable for the no-show fee of $550.00.

Neither Med-Set or Sun Life of Canada received any calls from you stating that Mr. Roxby was not going to attend this examination.

On November 18, 1999, Sun Life of Canada received a phone call from both Med-Set and Suncoast Rehabilitation indicating that Mr. Roxby did not attend the evaluation.

On November 18, 1999, Sun Life of Canada left a message at your office pertaining to this matter. We have not heard from you as to why Mr. Roxby did not attend this examination.

Our decision to uphold the denial is based on the information already submitted. The medical information along with the FCE and TSE on November 19, 1998, indicate that although Mr. Roxby has some restrictions/limitations, he appears capable of performing medium work. Our rehabilitation consultant noted on June 16, 1999 that "if we stepped down Mr. Roxby's restrictions to light vs. Medium, the TSA still shows a number of jobs that he is able and qualified to perform."

We scheduled the FCE for November 18, 1999, to further investigate his skills and to help us make a decision on his appeal. Since Mr. Roxby did not attend this examination, there is no other information to support his claim for disability from any occupation. Therefore, we are upholding our decision to deny his claim and no benefits are payable. This is our final determination and all levels of appeal have been exhausted.

If you have any questions, please feel free to contact our office at 1-800-247-6875.

Sincerely,


Jacqueline Heintz
Associate Claims Administrator
Group LTD

cc: Bruce Roxby

ROXBY 0050

SOCIAL SECURITY ADMINISTRATION
------------------------------------------------------------------------
            E X P L A N A T I O N   O F   D E T E R M I N A T I O N
------------------------------------------------------------------------
Name:                        NH's Name (CDB/DWB):        SSN:        Claim Type:
Bruce A Roxby                                            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    DIB
------------------------------------------------------------------------

The following evidence was used in evaluating your claim:

Associates In Physical Medicine response received 02/02/2000


You state that you are disabled because of bulging discs, central cord
syndrome, low back sprain, and coronary artery disease. After reviewing the
above medical record(s), we agree that you are disabled at this time.
However, we have determined that your condition did not become disabling until
after 05/25/93, the date you said that your disability began.  In making our
determination, we concluded that the evidence we received from Jeffrey C
Perkins M D shows your condition was disabling on 08/07/98.  Considering the
severity of your condition at that time, and our medical experience with your
type of condition, we are establishing 08/01/98 as the beginning date for your
disability.

The determination on this claim was made by an agency of the state.  It was
not made by your own doctor or by other people or agencies writing reports
about you   However, any evidence they gave us was used in making this
determination.  Doctors and other people in the state agency who are trained
in disability evaluation reviewed the evidence and made the determination
according to Social Security laws and regulations.

EXHIBIT T

Social Security Administration
**Retirement, Survivors and Disability Insurance**
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: April 14, 2000
Claim Number: 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HA

BRUCE A ROXBY
2636 SW 63RD TERRACE
NAPLES, FL 34116-7654

You are entitled to monthly disability benefits beginning January 1999.

**The Date You Became Disabled**

We found that you became disabled under our rules on August 1, 1998. This is different from the date given on the application.

Also, you have to be disabled for 5 full calendar months in a row before you can be entitled to benefits. For these reasons, your first month of entitlement to benefits is January 1999.

**What We Will Pay And When**

- You will receive $15,829.00 around April 20, 2000.

- This is the money you are due for January 1999 through March 2000.

- Your next payment of $1,312.00, which is for April 2000, will be received on or about the fourth Wednesday of May 2000.

- After that you will receive $1,312.00 on or about the fourth Wednesday of each month.

The day we make payments on this record is based on your date of birth.

Enclosure(s):
Pub 05-10018
Pub 05-10153

S                              See Next Page

## Your Benefits

The following chart shows your benefit amount(s) before any deductions or
rounding. The amount you actually receive(s) may differ from your full benefit
amount. When we figure how much to pay you, we must deduct certain
amounts, such as Medicare premiums. We must also round down to the nearest
dollar.

| Beginning Date | | Benefit Amount | Reason |
|---|---|---|---|
| January | 1999 | $1,047.60 | Entitlement began |
| December | 1999 | $1,078.30 | Cost-of-living adjustment |

## Other Disability Payments Affect Benefits

We have to consider workers' compensation and/or public disability payments
when we figure a Social Security benefit. The following will explain how these
payments affect Social Security benefits. For more information, please read the
enclosed pamphlet, "How Workers' Compensation and Other Disability Payments
May Affect Your Social Security Benefit."

The pamphlet explains how we reduce your Social Security disability checks if
the money which you would receive from Social Security and workers'
compensation payments adds up to more than 80 percent of your monthly
average current earnings. We found that 80 percent of your average current
earnings is $3,309.60.

We have to take into account your workers' compensation payment of $2,262.00
when we figure your Social Security benefits. Because you receive this payment,
we are reducing the benefits you are due.

We are reducing your monthly Social Security checks beginning January 1999,
which is the first month when you were entitled to both Social Security disability
benefits and workers' compensation payments.

Your benefit will be $1,047.60 beginning January 1999.

Your benefits were increased beginning December 1999. This increase was not
reduced because of workers' compensation payments.

We do not reduce benefits once workers' compensation payments have stopped.
Therefore, we are paying benefits at the full rate beginning April 2000. Please
let us know right away if you receive workers' compensation and/or other public
disability payments again.

## Other Social Security Benefits

The benefit described in this letter is the only one you can receive from Social
Security. If you think that you might qualify for another kind of Social Security
benefit in the future, you will have to file another application.

**Your Responsibilities**

The decisions we made on your claim are based on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "When You Get Social Security Disability Benefits...What You Need To Know." It will tell you what must be reported and how to report. Please be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.

A state or other public or private vocational rehabilitation provider may contact you to talk about their services. The rehabilitation provider may offer you counseling, training, and other services that may help you go to work. To keep getting disability benefits, you have to accept the services offered unless we decide you have a good reason for not accepting.

You do not have to wait to be contacted about vocational rehabilitation services. You can contact the nearest state vocational rehabilitation office directly and let them know that you are interested in receiving services.

If you go to work, special rules can allow us to continue your cash payments and health insurance coverage. For more information about how work and earnings may affect disability benefits, you may call or visit any Social Security office. You may wish to ask for any of the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).

- Social Security - If You Are Blind--How We Can Help (SSA Publication No. 05-10052).

- How Social Security Can Help With Vocational Rehabilitation (SSA Publication No. 05-10050).

It is important that you let us know if:

- There is any change in the workers' compensation payment or in any public disability payment you receive, or

- You receive a lump-sum award or any additional payments which supplement your workers' compensation or public disability payments.

**Do You Disagree With The Decision?**

If you think we are wrong, you have the right to appeal. A person who did not make the first decision will decide your case. We will correct any mistakes. We will review those parts of the decision which you believe are wrong and will look at any new facts you have. We may also review those parts which you believe are correct and may make them unfavorable or less favorable to you.

- You have 60 days to ask for an appeal.

- The 60 days start the day after you receive this letter.

- You must have a good reason if you wait more than 60 days to ask for an appeal.

**Things To Remember For The Future**

Doctors and other trained staff decided that you are disabled under our rules. But, this decision must be reviewed at least once every 3 years. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

**If You Want Help With Your Appeal**

You can have a friend, lawyer or someone else help you. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past due benefits to pay toward the fee.

**If You Have Any Questions**

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-941-593-9776. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:

> SOCIAL SECURITY
> PEACOCK COURT
> 6214 TRAIL BLVD NORTH
> NAPLES, FL 34108



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HA                                        Page 5 of 5

If you do call or visit an office, please have this letter with you. It will help us
answer your questions. Also, if you plan to visit an office, you may call ahead to
make an appointment. This will help us serve you more quickly when you arrive
at the office.

*W Burnell Hurt*

W. Burnell Hurt
Associate Commissioner for
Central Operations