UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6197-CIV-ZLOCH/SELTZER

BRUCE ROXBY,

       Plaintiff,

vs.

SUN LIFE OF CANADA,
SUN LIFE OF CANADA REINSURANCE COMPANY,
SUN LIFE ASSURANCE COMPANY OF CANADA, and
SUN LIFE OF CANADA (U.S.) DISTRIBUTORS, INC.,

       Defendants.



_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Defendants' Motion for Summary Judgment

(DE 18) and was referred to United States Magistrate Judge Barry S. Seltzer pursuant to

the consent of the parties. For the reasons set forth below, Defendants' Motion is hereby

GRANTED.

I.    BACKGROUND

Plaintiff Bruce Roxby ("Plaintiff") brings this action against Defendants Sun Life of

Canada, Sun Life of Canada Reinsurance Company, Sun Life Assurance Company of

Canada, and Sun Life of Canada (U.S.) Distributors, Inc., (collectively, "Defendants").

1

Plaintiff seeks review of Defendants' decision to deny him long-term disability benefits under an employee welfare plan ("the Plan") sponsored by his employer. Long-term disability benefits under the Plan were funded by a group policy of disability insurance issued by Defendants. The parties agree that the Plan is governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA").[1]

Defendants had initially paid to Plaintiff disability benefits for a 60-month period following a work-place accident because he was "totally disabled" from his "regular occupation." After the initial 60-month period, however, the Plan's definition of "total disability" changed, requiring that a claimant be "totally disabled" from "any occupation." Under this new definition, Defendants determined that Plaintiff was no longer "totally disabled" and denied continued benefits. They also denied continued benefits because Plaintiff had frustrated their efforts to evaluate his physical condition by refusing to attend a scheduled independent Functional Capacity Evaluation ("FCE"). Plaintiff counters that Defendants' decision was unreasonable. He maintains that in denying continued benefits Defendants rejected the conclusions of one of his treating physicians in favor of paid non-physician consultants. And he contends that the Plan did not obligate him to submit to an examination by Defendants' non-physician consultants.

II.   FACTS

Plaintiff, an automobile mechanic, participated in an employee disability benefit plan sponsored by his employer. To be eligible for benefits under the Plan, an employee had

---

[1] Title 29 U.S.C. § 1132(a)(1)(B) permits the beneficiary of an ERISA-governed plan to bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

to be "totally disabled," the definition of which changes after an initial 60-month period.[2]

According to the Plan:

> An Employee is totally disabled if he is in a continuous state of incapacity due to Illness which:

> 1.    while it continues throughout the Elimination Period and during the following 60 months of incapacity, prevents him from performing all of the material duties of his regular occupation;

> 2.    while it continues thereafter, prevents him from engaging in any occupation for which he is or becomes reasonably qualified by education, training or experience.

(emphasis added.)  To receive benefits, the Plan requires that a claimant first provide proof

of disability, that such proof be "satisfactory to [Defendants]," and that a claimant submit

to such examinations as Defendants may reasonably require.  The Plan contains the

following provisions:

- "We may require proof in connection with terms or benefits of this policy." "If proof is required, we must be provided with such evidence as is satisfactory to us . . . ."

- "We must receive written notice of claim . . . ." "We must receive written proof of claim . . . ."

- "The proof, which must be satisfactory to us, is to be given to us at our Office."

- "If we receive due Notice and Proof of Claim that . . . an insured became totally disabled while insured . . . and his Total Disability continued beyond the Elimination Period . . . we will pay . . . a Total Disability Benefit."

- "We have the right to examine any person for whom a

---

[2]  In this case, the definition changed effective November 28, 1998.

3

> claim for benefit payment has been made and to do so
> as often as we may reasonably require."

Plaintiff filed the subject claim for disability benefits in December 1993. Approximately five years earlier, he had been involved in an automobile accident, following which he was diagnosed with disc injuries and related ulnar neuropathy. Thereafter, he returned to work.

On May 23, 1993, while working under a car, Plaintiff stood up and hit his head on a tire. Plaintiff cited a "neck and back injury" sustained during this work-related accident in his December 1993 claim for benefits.

On May 26, 1993, Dr. Arnold Lang, a neurologist, examined Plaintiff. Dr. Lang diagnosed a low grade cervical radiculopathy at C6-7, with some numbness and tingling. On June 2, 1993, Dr. Lang reported that Plaintiff's MRI was normal ("no evidence of disc herniation or spinal stenosis"), that Plaintiff had presented with C7 radiculopathy but was "improved," and that Plaintiff could return to work at light duty for two to three hours per day.

On January 17, 1994, Defendants received from Dr. Alan Novick medical records for June through December 1993 concerning Plaintiff's injury. On June 14, 1993, Dr. Novick had examined Plaintiff and diagnosed myofascial syndrome, cervical strain, probable left lumbar facet syndrome, and probable right ulnar neuropathy; all treatment was conservative. In notes dated December 8, 1993, Dr. Novick reported that Plaintiff had reached his maximum medical improvement and assigned him a disability rating of 17.5%. Further, in an Attending Physicians Statement of Disability, Dr. Novick rated Plaintiff's disability as Class 4 - "moderate limitation of functional capacity; capable of

4

clerical/administrative (sedentary activity)." In response to questions on the form, Dr. Novick stated that although Plaintiff was totally disabled from his (current) job, he was not totally disabled from "any other job" and could perform "light duty only, no heavy lifting, needs to frequently reposition."

On February 10, 1994, Plaintiff's employer advised Defendants that Plaintiff could not return to work doing light duty because no light duty position was available for which he was qualified. The following day, Defendants approved Plaintiff's claim for long term disability benefits conditioned upon his furnishing satisfactory evidence of his continuing total disability.

On October 3, 1994, Dr. Jay Mendelsohn examined Plaintiff. Like Dr. Novick, he reported that Plaintiff was not disabled from "any other job," that he could perform light work, and that he had a Class 4 physical impairment.

On March 28, 1995, Dr. George Bonis examined Plaintiff and completed an Attending Physician's Statement of Disability. Like Dr. Novick and Dr. Mendelsohn, Dr. Bonis stated that although Plaintiff was totally disabled from his current job, he was not disabled from "any other job." He further reported that Plaintiff could perform light duty work, and he rated Plaintiff's physical impairment as Class 4.

On June 25, 1996, Dr. Dagaberto Garcia examined Plaintiff. He completed an Attending Physician's Statement of Disability, reporting that while Plaintiff was totally disabled from his current job, he was not disabled from "any other job." Like Dr. Novick, Dr. Mendelsohn, and Dr. Bonis, Dr. Garcia reported that Plaintiff was capable of "light duty" and rated his physical impairment as Class 4 - "moderate limitation of functional capacity: capable of clerical/administrative (sedentary) activity."

5

On October 30, 1996, Dr. Jeffrey Perkins, an associate of Dr. Novick, examined Plaintiff and reported that he continued to experience chronic cervical and low back pain. He diagnosed "status post cervical lumbar strain, sprain" and "probable central cervical spinal cord injury," and he recommended that Plaintiff continue his exercise program. Like Dr. Novick, Dr. Mendelsohn, Dr. Bonis, and Dr. Garcia, Dr. Perkins rated Plaintiff's impairment as Class 4 and stated that although Plaintiff was totally disabled from his current job, he was not disabled from "any other job."

On October 28, 1997, approximately one year prior to the expiration of the 60-month regular occupation period, Defendants received an October 9, 1997 Attending Physician's Statement from Dr. Perkins. In the Statement, Dr. Perkins once more classified Plaintiff's disability as Class 4 - "moderate limitation of functional capacity; capable of clerical/administrative (sedentary activity)." And he assigned Plaintiff a disability rating of 5 % to 10 % due to chronic cervical and lumbar strain and probable central cervical spinal cord injury.

On June 24, 1998, Defendants advised Plaintiff that the 60-month "regular occupation" period would expire on November 22, 1998, and that he would then need to provide evidence of "total disability" from "any occupation." On September 3, 1998, Defendants received another Attending Physician's Statement from Dr. Perkins, dated August 7, 1998. Dr. Perkins reported that Plaintiff was ambulatory and that he could stand/walk up to 4 hours per day, drive up to 3 hours per day, sit up to 3 hours per day, and use his hands for repetitive, simple grasping. When asked whether Plaintiff's prognosis would improve and whether Plaintiff could work with these limitations, Dr. Perkins checked "part-time" and noted "maybe." He also recommended that Plaintiff

6

undergo vocational rehabilitation and/or counseling. In notes dated August 7, 1998, Dr. Perkins rated Plaintiff's permanent disability at 10%. He diagnosed a C5-C6 disc herniation and lumbar sprain and again classified Plaintiff's physical impairment as Class 4.[3]

During Plaintiff's initial 60-month period of disability, physicians and others advised Plaintiff to pursue vocational rehabilitation and/or training; he refused. On December 5, 1993, Plaintiff told Defendants: "I do not wish to retrain"; and "I am only interested in auto repair." Similarly, in 1994, Plaintiff failed to cooperate with vocational rehabilitation counseling that Defendants had attempted to schedule. And following a February 14, 1997 interview with Plaintiff, claims consultant M.J. Yearout, reported: "[Plaintiff] has no return to work plans, either full or part time." According to Yearout, Plaintiff indicated that although he would be very interested in returning to his former occupation, no other employment would interest him. Yearout concluded: "[Plaintiff's] attitude towards eventual recovery seems to be poor and he does appear to have given up hope of returning to work and has accepted his condition as permanent."

On October 26, 1998, Defendants placed Plaintiff's claim file under medical review and scheduled him for an independent Functional Capacity Evaluation ("FCE") and a Transferrable Skills Analysis ("TSA"). On November 19, 1998, Constance Horzorn, P.T., and Janeen Daniels, M.S., issued their Work Capacities Assessment Report, pursuant to an FCE conducted that same day. They summarized their findings:

---

[3] Throughout the 60-month period of "regular occupation" benefits, every physician who evaluated Plaintiff rated his disability as Class 4 - "moderate limitation of functional capacity; capable of clerical/administrative (sedentary activity)." No physician opined that Plaintiff was totally disabled from any occupation.

7

Mr. Roxby is a 51 year old male with a current diagnosis of status post cervical spinal cord injury and cervical/lumbar strain/sprain syndrome, onset 5/25/9[3]. He reported that his injuries took place when he hit his head on a car tire while walking out from under a vehicle up on a hydraulic jack. Deficits found in the musculoskeletal evaluation included: postural and gait deviations; decreased spinal range of motion; decreased bilateral shoulder and abdominal strength; decrease[d] lower extremity flexibility with limits greater on left; positive root tension tests on right; tenderness over C7 region; diminished lower extremity reflexes; unable to elicit C6-7 reflex. Other medical history positive for coronary artery disease diagnosed in May 1998 by Dr. Francis Schwerin (further medical evaluations and procedures pending).

Mr. Roxby had a Waddell's test score in the negative range (4 out of 16) for magnified illness behavior. Dynamometer testing revealed consistent effort on 6 out of 8 tests. Ransford Pain Diagram was negative for non-anatomical distributions of pain. Multidimensional Pain Inventory revealed dysfunctional coping skills regarding pain management. No inconsistencies in performance were observed during formal and informal evaluation.

Functional testing revealed that Mr. Roxby is presently lifting in the Medium category of work as demonstrated by his occasional floor to knuckle lift of 45 pounds, knuckle to shoulder lift of 35 pounds, shoulder to overhead lift of 22 pounds, and carry of 30 pounds 100 feet with pivoting. During positional tolerance testing, the client demonstrated tolerance of sitting on a constant basis; standing, repetitive bending, repetitive reaching, repetitive squatting, sustained squatting, kneeling, pivot twisting, pushing/pulling, assemble, fine motor, and simple grasping on a frequent basis; and walking, stair climbing, sustained bending, overhead reaching, ladder climbing, writing, and firm grasping on an occasional basis.

They reported that Plaintiff "currently demonstrates the ability to perform work within the

Medium category or less, full-time, limiting walking, sustained bending, overhead reaching,

ladder climbing, writing, and firm grasping to an occasional basis." Accordingly, they

concluded that Plaintiff could perform medium level work of eight-hours per day but that

8

he first be cleared by his cardiologist before returning to work. Finally, they noted that Plaintiff demonstrated "possible dysfunctional coping with regard to his current physical condition."

On November 25, 1998, rehabilitation consultant, William J. Harney, C.R.C., L. R.C., performed a TSA. He surveyed several broad categories of work for which Plaintiff's skills would be transferrable and for which Plaintiff had the physical capacity to work pursuant to the FCE. In making his assessment, Harney noted that Plaintiff was a certified mechanic and had been employed as an air traffic controller while in the military. Harney's analysis showed a number of occupations for which Plaintiff was qualified based on his residual skills: service-repair estimator; service manager; dispatcher; auto tester; and auto damage appraiser. According to Harney:

> The required ability to deal with people as a mechanic would not be affected by his limitations an[d] would be an asset in customer service roles as mentioned above. His past military experience in the Air Traffic Control position is also useful. His familiarity with the air transportation industry, albeit at the military level, would still be of some value for the less physical occupations within that field.
>
> Overall, this individual does have residual skills that are transferable to a number of occupations and, therefore, does not appear to be disabled from all occupations.

On December 9, 1998, Defendants informed Plaintiff of its decision to deny his claim for benefits beyond the 60-month "regular occupation" period. On January 27, 1999, Plaintiff's attorney objected to Defendants' decision and submitted additional medical records of Dr. Perkins dated January 7, 1999. Dr. Perkins reported: "I disagree with [the FCE that Plaintiff could perform medium work for 8-hours per day]. I feel the patient has a very limited capacity with a very limited endurance to enable him to carry out a full job

9

of 8 hours a day. . . . At best he would only qualify . . . for short term, less than four hours

a day in minimum capacity."

On April 19, 1999, Defendants received the medical records of Dr. Schwerin,

Plaintiff's cardiologist, who reported that a May 1998 stress test showed that Plaintiff had

experienced some "mild" exercise-induced ischemia. Dr. Schwerin also reported that he

agreed with the cardiovascular assessment of the FCE, that Plaintiff was "asymptomatic,"

and that any cardiovascular disease of Plaintiff "probably contributed minimally to his

disability."

On June 10, 1999, Defendants referred Plaintiff's claim for a second medical review.

After reviewing the claim file, Dr. Valery Kaufmann, a cardiologist, reported:

> FCE suggests some R & L [restrictions and limitations], but
> considerable residual functionality. (2) Appears to have some
> CAD [coronary artery disease], although not very limiting.
> Should not perform heavy physical or sustained physical
> exertion, but appears capable of sedentary or light duty work
> per Dr. Schwerin's letter.

In response to Dr. Kaufmann's evaluation, Defendants' rehabilitation consultant, William

Harney, stated that "[if] we step down his restrictions to light vs. medium the TSA still

shows a number of occupations that he is able & qualified to perform."

By letter dated July 1, 1999, Defendants informed Plaintiff of its decision to deny

Plaintiff's claim for benefits beyond the 60-month "regular occupation" period, and they

advised as to the medical basis therefor. On August 27, 1999, Plaintiff appealed

Defendants' decision.[4]

---

[4] Title 29 U.S.C. § 1133(2) requires that every employee benefit plan "afford a
reasonable opportunity to any participant whose claim for benefits has been denied for
a full and fair review by the appropriate named fiduciary of the decision denying the

On September 1, 1999, Defendants received additional medical records of Dr. Perkins dated June 3, 1999, again reporting that Plaintiff had a very limited capacity and endurance and was unable to carry out his full job. Dr. Perkins opined: "[Plaintiff] is only able to work approximately four hours a day at minimum capacity." Dr. Perkins also stated that if Plaintiff were to return to work, he would need to be under the following restrictions: limited walking, decreased overhead reaching, no ladder climbing, and no excessive grasping or writing.

On October 21, 1999, Defendants advised Plaintiff that it required additional time for a "full and fair review" of his appeal and stated that it intended to conduct another FCE of Plaintiff. By letter dated October 28, 1999, Med-Set, an independent medical examination scheduling company, notified Plaintiff's attorney that an FCE had been scheduled for Plaintiff on November 18, 1999, at the offices of Suncoast Rehabilitation, an independent examiner. The notice advised Plaintiff to inform Med-Set if he were unable to attend the FCE and further advised that he could be liable for a $550 no-show fee if he failed to cancel within Suncoast's 48-hour time limit.

Plaintiff failed to appear at Suncoast for the second independent FCE; he provided no advance notice and offered no explanation for his failure. After learning of Plaintiff's non-appearance, Defendants called Plaintiff's attorney seeking information about the matter and left a message. Neither Plaintiff nor his attorney responded to Defendants' message. Defendants ultimately paid the $550 no-show fee.

By letter dated November 19, 1999, Defendants notified Plaintiff's attorney that it

claim."

11

had decided to affirm its denial of Plaintiff's claim for benefits beyond the 60-month "regular

occupation" period. The letter cited Plaintiff's unexplained failure to appear at the second

FCE on November 18, 1999. The letter further stated that the decision to uphold the denial

of benefits was based on the information previously provided, as well as the first FCE and

TSA. These reports revealed that although Plaintiff had some restrictions and limitations,

he remained capable of performing medium work. In addition, the letter referenced the

opinion of Defendants' rehabilitation consultant, who stated that even if Plaintiff's

restrictions were stepped down to light work, the TSA would still show a number of jobs he

is able and qualified to perform. Defendants' letter concludes:

> We scheduled the FCE for November 18, 1999, to further
> investigate his skills and to help us make a decision on appeal.
> Since [Plaintiff] did not attend this examination, there is no
> other information to support his claim for disability from any
> occupation.

### III.    STANDARD OF REVIEW ON SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment

where the pleadings and supporting materials show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law. An

issue is "genuine" if a reasonable jury could return a verdict for the nonmoving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202

(1986). A fact is "material" if it must be decided to resolve the substantive claim or defense

to which the motion is directed. Id.; Hairston v. Gainesville Sun Publ'g. Co., 9 F.3d 913

(11th Cir. 1993).

The moving party has the burden to establish the absence of a genuine issue as to

any material fact. Adickes v. S.H. Kress and Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608,

12

26 L.Ed.2d 142 (1970). Once the movant has satisfied its initial burden, the non-moving party must then go beyond the pleadings to rebut any facts properly presented; it may do so through affidavits or other evidence showing the existence of genuine issues of material fact for trial. Fed. R. Civ. P. 56(e); Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986); Adickes, 398 U.S. at 160, 90 S.Ct. at 1610.

Summary judgment is appropriate when, after adequate time for discovery, the non-moving party cannot establish an essential element on which it bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. See also Earley v. Champion Int'l Corp., 907 F.2d 1077 (11th Cir. 1990).

In considering the motion, the Court must construe the evidence and the inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Furthermore, facts asserted by the party opposing a summary judgment must be regarded as true if supported by affidavit or other evidentiary material. Coke v. General Adjustment Bureau, Inc., 640 F.2d 584, 595 (5th Cir. 1981)(quoting 10C Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure, § 2727 at 524-30 (1973)).

IV.    LAW AND ANALYSIS

A.    ERISA Standard of Review

The parties agree that this case is governed by ERISA; they disagree as to the

13

standard of review that ERISA requires this Court to apply to Defendants' decision. Plaintiff contends that this Court should review Defendants' decision under the "de novo" standard; Defendants respond that the Court should review its decision under the (more deferential) "arbitrary and capricious" standard.

The ERISA statute itself does not provide a standard of review. In Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that a denial of ERISA benefits is to be reviewed under a "de novo" standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan. Where such discretion is granted, the administrator's decision would ordinarily not be subject to judicial review except to prevent an abuse of that discretion. However, where a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, the court must weigh that conflict in determining whether the discretion has been abused. Id. at 115, 109 S.Ct. at 956-57.

Pursuant to Firestone, this Circuit has adopted three standards of review for plan interpretations: 1) "de novo," applied when the plan does not grant the administrator discretion to determine eligibility for benefits or to construe the terms of the plan; 2) "arbitrary and capricious," applied when the plan grants the administrator discretion; and 3) "heightened arbitrary and capricious," applied when a plan administrator with discretion has a conflict of interest. Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1449 (11th Cir. 1997); Buckley v. Metro. Life, 115 F.3d 936, 939 (11th Cir. 1997).

The threshold question, therefore, is whether the plan grants the administrator discretionary authority. For such authority to be found, the plan must contain express and

14

unambiguous language giving the administrator the discretion to determine eligibility for benefits or to construe the terms of the plan. Kirwan v. Marriott Corp., 10 F.3d 784, 788, 789 (11th Cir. 1994). Where the court finds such express and unambiguous language, it must then determine whether the administrator is operating under a conflict of interest. An inherent conflict of interest exists when the funding source for the benefits is also determining a claimant's eligibility for such benefits. Brown v. Blue Cross/Blue Shield of Ala., Inc., 898 F.2d 1556, 1562 (11th Cir. 1990), cert. denied, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

When a fiduciary operates under a conflict of interest, "[t]he standard of review... remains arbitrary and capricious with a significantly diminished degree of deference." Adams v. Thiokol, No. 99-11734, 2000 WL 1587660, at * 3 (11th Cir. Oct. 25, 2000). See also Yochum v. Barnett Banks, Inc. Severance Pay Plan, No. 99-13581, 2000 WL 1769570 (11th Cir. Dec. 1, 2000)("heightened arbitrary and capricious" standard of review where there is a conflict of interest in the decision making process for benefits). Under this "heightened arbitrary and capricious" standard, the court must first determine, de novo, the legally correct plan interpretation; if the court determines that the fiduciary's determination is correct, the inquiry ends. Adams, 2000 WL 1587660, at * 4; Brown, 898 F.3d at 1567 n.12 ("It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary.") If the court determines that the administrator's decision is wrong, it must then examine whether the administrator was arbitrary and capricious in arriving at its interpretation. "[A] wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the

15

affected [participant] . . . unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants. . . . " Id. at 1566-67. Yet, even were the fiduciary to establish that its decision was not tainted by self-interest, the claimant could still succeed by showing that the decision was arbitrary and capricious by other measures. Id. at 1568.

Here the Plan requires that Plaintiff provide Defendants with such evidence of disability as is "satisfactory to us." The phrase "satisfactory to us" has been construed by several appellate and trial courts to signal the subjective, discretionary character of the judgment to be made. See Herzberger v. Standard Ins. Co., 205 F.3d 327, 331 (7th Cir. 2000)("to us" signals subjective, discretionary character)(citing Donato v. Metro. Life Ins., 19 F.3d 375, 379 (7th Cir. 1994)); Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 251-252 (2nd Cir. 1999)(distinguishing "proof that is satisfactory" from "proof that is satisfactory to [the decision maker]," the former denoting an objective standard and the latter denoting a subjective one); Wilcox v. Reliance Standard Life Ins. Co., 175 F.3d 1018 (Table), No. 98-1036, 1999 WL 170411, at * 2 (4th Cir. March 23, 1999.)("Only the most tortured reading of the language [submits satisfactory proof of Total Disability to us] could lead to a conclusion that the plan in this case is not vested with the discretionary authority to determine eligibility for benefits.); Perez v. Aetna Life Ins., 150 F.3d 550, 557 n. 8 (6th Cir. 1998)(noting that "many of our prior cases finding a clear grant of discretion involved ERISA plans which explicitly provided that the evidence be satisfactory 'to the insurer,' 'to the company' or 'to us'"); Andrews v. Standard Ins. Co., No. 99-C-2126, 2000 WL 549466, at * 4 (N.D. Ill. April 28, 2000)("satisfactory to us" language sufficient to trigger arbitrary and capricious standard)(citing Donato, 19 F.3d at 379); Metropolitan Life Ins. Co. v. Socia, 16 F. Supp. 2d 66, 69 (D. Mass. 1998)("all proof must be satisfactory to us" language vests

16

insurance company with discretionary authority to deny benefits).

Furthermore, other courts interpreting the policies of the same (Sun Life) Defendants, which policies contain very similar ("satisfactory to us") language, have concluded that such language grants Defendants discretion to assess benefit claims. See Sorrells v. Sun Life Assurance Co. of Canada, 85 F. Supp. 2d 1221, 1229 (S.D. Ala. 2000)("Proof must be satisfactory to Sun Life" grants discretion to review claim); Harrison v. Sun Life Assurance Co. of Canada, No. 98-C-2994, 1999 WL 528519, at * 1 (N.D. Ill. July 19, 1999)("In this case, the policy broadly states that a claimant's proof of disability must be satisfactory to Sun Life, and we thus apply the [arbitrary and capricious] standard [which applies to ERISA decision-makers who exercise discretion]."); Marchetti v. Sun Life Assurance Co. of Canada, 30 F. Supp. 2d 1001, 1007 (M.D. Tenn. 1998)(finding grant of discretion in language of Plan that provided, "[t]he proof, which must be satisfactory to us"); Nelson v. Sun Life Assurance Co. of Canada, 962 F. Supp. 1010, 1012 (W.D. Mich. 1997)("Where proof of eligibility for benefits must be 'satisfactory' to the company, courts have characterized the company's authority as discretionary within the meaning of [Firestone Tire & Rubber].").

This Court concurs that the most logical reading of the phrase "satisfactory to us" signals the subjective, discretionary character of the judgment to be made. Accordingly, the Court concludes that the Plan's language confers upon Defendants sufficient discretion to insulate them from "de novo" review. Yet, from this conclusion, it does not necessarily follow that this Court should invoke the "arbitrary and capricious" standard of review.

Although Defendants here are authorized by the Plan to exercise discretion in assessing claims, they labor under an inherent conflict of interest; Defendants are both the

17

decision-makers and the funding source.[5] Accordingly, the degree of deference this Court would otherwise accord Defendants under the "arbitrary and capricious" standard is significantly diminished; the Court should instead review Defendants' decision under the "heightened arbitrary and capricious" standard. See Brown, 898 F.2d at 1568. In this matter, however, the particular standard of review is of no consequence as Defendants' decision must be upheld under any standard of review, including the more stringent "de novo" standard. The Court bases its conclusion on two (independent) grounds: 1) by failing to submit to an FCE, Plaintiff breached its agreement with Defendants and frustrated their ability to conduct a full and fair review of Plaintiff's appeal; 2) the medical evidence, including a treating physician's opinion that Plaintiff can perform part-time work, establishes that he is not "totally disabled" from "any occupation."

B.     Failure to Attend FCE

The Plan expressly provides: "We have the right to examine any person for whom a claim for benefit payment has been made and to do so as often as we may reasonably require." The parties do not dispute that this provision is contained within the Plan. Nor do the parties dispute that, despite being given sufficient notice of the FCE, Plaintiff at the time neither objected to the examination nor explained his non-appearance.

Plaintiff contends that his failure to attend is not sufficient reason to deny him benefits. He submits that the Plan does not provide that a failure to attend is grounds for terminating benefits and that even if his failure were a breach of the Plan, it was not material. Finally, Plaintiff argues that the Plan cannot be interpreted to allow for an

_____

[5] The parties do not appear to contest that Defendants both assess the claims and fund the benefit payments.

18

examination by someone who is not a physician. This Court does not agree.

In two separate provisions, the Plan requires that a claimant submit to an examination when required to do so for the purpose of determining his entitlement to disability benefits. Few provisions could be more material to the agreement, and their violation more threatening to the financial integrity of the Plan and the welfare of other Plan participants, than Defendants' right to have claimants examined to assess allegations of disability.[6]   See Gonzalez v. Guarantee Mut. Life Co., No. C-97-4213-SC,1999 WL 329096, at * 5 (N.D. Cal. May 19, 1999)("Plaintiff's continual refusal to submit to a medical examination as specifically required by the Plan, requires and justifies a denial by Defendant Guarantee to pay benefits under the Plan."). Indeed, in a July 16, 1996 letter, Plaintiff's own treating physician (Dagaberto J. Garcia, M.D.) opined that the information Defendants required to assess Plaintiff's disability claim "would best be answered by a Functional Capacity Evaluation." Were it otherwise, insurance companies would be left to rely entirely on whatever documentation a claimant chose to submit.

Furthermore, Plaintiff's contention that he be examined by a physician only finds no support in the Plan. The Plan invests Defendants with the discretion to determine the

---

[6]     Other district courts considering a claimant's failure to appear for an FCE have deemed such non-appearance as contributing to a failure to exhaust administrative remedies and, accordingly, have dismissed the action. See, e.g., Stephenson v. Provident Life & Accident, Ins. Co., 1 F.Supp. 2d 1326, 1332 (M.D. Ala. 1998); La France v. Aetna Life and Cas., No. 92-2077, 1995 WL 644053, at * 3 (E.D. La. October 31, 1995). See also Zalka v. Unum Life Ins. Co. of Am., 65 F. Supp. 2d. 1369, 1371 (S.D. Fla. 1998)("By refusing to submit to the IME and immediately filing suit, however, Plaintiff precluded Defendant from completing its administrative review of her claim. Plaintiff has thus not exhausted her administrative remedies . . . . [and, thus] summary judgment for the Defendant is proper.")( King, J.), aff'd, 170 F.3d 188 (11th Cir. 1999)

19

nature of the examinations to be conducted, their frequency, and the experts who should undertake them. Indeed, a variety of experts might reasonably be enlisted to assist Defendants in assessing the many conditions that could provide a basis for disability. Were it as Plaintiff suggests, Plan administrators could never seek the independent expert opinion of physical therapists, occupational therapists, psychologists, and social workers. Indeed, judicial decisions construing ERISA have approved FCE's conducted by non-physician health professionals such as physical therapists and occupational therapists. See, e.g., Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 185 (1st Cir. 1998); Hotaling v. Teachers Ins. and Annuity Assoc. of Am., 62 F. Supp. 2d 731, 734, 740 (N.D.N.Y. 1999); Sovo v. Wheaton Franciscan Services, Inc. Health and Welfare Benefit Trust, 40 F. Supp. 2d 1031, 1033 (E.D. Wis. 1999); Rutledge v. Am. Gen. Life and Accident Ins. Co., 914 F.Supp. 1407, 1409 (N.D. Miss. 1996).

Here, the alleged disability involved movement limitations for an individual (Plaintiff) who had reportedly reached his maximum medical improvement. It was reasonable, therefore, for Defendants to have required (as they did) that Plaintiff be examined by a physical therapist to assess the alleged movement limitations.

Plaintiff's non-appearance at the FCE alone warrants summary judgment for Defendant. After Plaintiff had appealed Defendants' decision to deny continued benefits, Defendants agreed to give Plaintiff a second opportunity to establish his entitlement to such benefits by scheduling a second independent FCE; Plaintiff does not allege that he failed to receive the notice of this FCE. Plaintiff, however, failed to notify either Defendants or the examiners that he would not attend the second FCE, failed to raise any objections to the FCE, and failed to request any alternate arrangements to the FCE; instead, he

20

simply failed to appear. His non-appearance resulted in a $550 no-show fee, which Defendants ultimately bore. Plaintiff's willful failure to honor a reasonable request to appear for an FCE by a physical therapist constituted a material breach of the agreement and precluded Defendants from conducting a full and fair review of his administrative appeal.

### C.    Ability to Engage in "Any Occupation"

Viewing the evidence in the light most favorable to Plaintiff, he is not "totally disabled" from "any occupation." From the time Plaintiff was injured until the time Defendants denied his claim, no physician ever assigned Plaintiff a disability rating lower than Class 4 - "*moderate limitation of functional capacity; capable of clerical/administrative (sedentary activity).*" Every treating physician adjudged Plaintiff capable, at the very least, of performing light or sedentary labor. and every treating physician opined that he is not totally disabled from "any other job." Such medical records alone compel a finding that Plaintiff is not "totally disabled" from "any occupation." And even Dr. Perkins, upon whose January and June 1999 notes Plaintiff relies in support of his disability claim, opined that he (Plaintiff) is capable of at least part-time work, which precludes a finding of "total disability" from "any occupation."

The Plan here distinguishes total disability from partial disability. In pertinent part, the Plan defines "totally disabled" as a continuous state of incapacity due to illness which prevents the claimant "from engaging in any occupation for which he is or becomes reasonably qualified by education, training or experience." By contrast, the Plan defines "*partial disability*" *as engaging in* "*partial disability employment,*" *which, in turn, is defined as employment* "in which an Employee performs at least one of the material duties of his

21

Regular Occupation or another occupation on a part-time or a full-time basis." (emphasis added). Accordingly, Dr. Perkins' opinion that Plaintiff is capable of performing part-time employment precludes a finding under the Plan of "total disability" from "any occupation." Other courts have similarly found that an ERISA claimant's ability to perform part-time work precludes a finding of total disability. See, e.g., Terry v. Bayer Corp., 145 F.3d 28, 41 (1st Cir. 1998)(upholding termination of disability benefits where several physicians determined that claimant could perform either part-time or full-time sedentary work); Doyle, 144 F.3d at 186 (finding that claimant was not totally disabled from any occupation because he retained a sedentary work capacity; "That his capacity, initially at least, may have been limited to part-time work does not require concluding otherwise."); Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1452 (11th Cir. 1997)(upholding plan administrator's determination that claimant could engage in any occupation whatsoever for compensation or profit, including part-time work); Marecek v. Bell South Telecomm, Inc., 49 F.3d 702, 705 (11th Cir. 1995)(under plan, part-time work capacity precludes sickness disability benefits); Hotaling, 62 F. Supp. 2d at 739, 740 (claimant's ability to perform at the light level and work on a part-time basis would not qualify her as "disabled," defined as the inability "to perform any occupation for which you are reasonably suited by education, training, or experience"); Cini, 50 F.Supp. 2d at 424 (citing claimant's ability to return to work on a part-time basis as grounds for upholding ERISA plan administrator's denial of claim for disability benefits).

The medical record fully supports Defendants' decision to deny Plaintiff continued disability benefits. No physician at any time opined that Plaintiff is "totally disabled" from "any occupation," and the FCE and TSA found him capable of full-time work. At the very least, according to one of Plaintiff's several treating physicians, he could perform part-time

22

work. Under the Plan, therefore, Plaintiff is not "totally disabled" from "any occupation."

V.    CONCLUSION

Although this Court concludes that the facts here warrant review under the "heightened arbitrary and capricious" standard, it further concludes that Defendants are entitled to summary judgment under any standard of review.   Plaintiff willfully and intentionally and without notice or explanation failed to appear for an FCE to assess the merits of his claim and his appeal.  Such a material breach of the agreement alone justifies Defendants' denying his claim.  Further, the medical record fully supports Defendant's determination that Plaintiff is not "totally disabled" from "any occupation."

DONE AND ORDERED in Fort Lauderdale this $\widehat{\bigcirc}$ day of February, 2001.

BARRY S. SELTZER
United States Magistrate Judge

Copies to:

John P. Murray Esquire
The Wagar Law Firm
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Attorney for Plaintiff

Mark D. Greenberg, Esquire
Greenberg & Lagomasino, P.A.
799 Brickell Plaza, Suite 700
Miami, Florida 33131
Attorney for Defendants

Mark E. Schmidtke, Esquire
Hoeppner, Wagner & Evans LLP
103 Lincoln Way
P.O. Box 2357
Valparaiso, Indiana 46384-2357

23

Spencer A. Emison, Esquire
1999 SW 27th Avenue, 1st Floor
Miami, Florida 33145